28 445
78a 395

## JOHN VAN HORN, Appellant, *v.* MARGARET KEENAN *et al.*, Appellees.

### APPEAL FROM OGLE.

An injunction to prevent the sale of mortgaged premises will be made perpetual, where it appears that the party executing the mortgage was rendered imbecile by habitual drunkenness, and reduced to a condition verging upon insanity, by the mortgagee, who had obtained complete power over the mortgagor ; the mortgagee not being able to show that he had given any valid consideration for the mortgage.

THIS case is stated fully in the opinion of Mr. Justice BREESE.

The proceedings were had in the Ogle Circuit Court, before EUSTACE, Judge.

B. C. COOK, for Appellant.

LELAND & BLANCHARD, and H. A. MIX, for Appellees.

BREESE, J.    The appellant, holding a note and mortgage, executed by one Patrick Keenan in his lifetime, sought, after his death, to subject the mortgaged premises to sale, by *scire facias*, against the widow and heirs at law of the deceased, to satisfy the debt secured by it.    Pending the suit, the widow and heirs at law filed their bill in chancery, to enjoin appellant from proceeding with his suit, alleging, as grounds for the interposition of the court, that at the time of the execution of the note and mortgage, deceased was not of sound mind and memory, and also, that they were executed without any good or valuable consideration, and with the design of defraud-

ing the complainants, and delaying creditors in their rights in the estate of the deceased.

The mortgage was executed on the 27th day of February, 1856, and duly recorded. Keenan died on the 5th of August, of that year. The bill alleges, that to complainant, Margaret Keenan, letters of administration had been granted, and that claims against the estate had been allowed by the County Court, to the sum of five hundred and fifty-eight dollars and ninety-one cents, and that she, herself, has a demand against the estate, under the provisions of the law, amounting to five hundred and two dollars, and has no assets to pay any of the claims. The note and mortgage executed to appellant, were for the sum of eight hundred and twenty-seven dollars and seventy-five cents, payable, with interest, six months after date. It is alleged, the mortgaged premises are of the value of eight hundred dollars.

The appellant, defendant to the bill, put in his answer under oath, in which he denies all the material charges in the bill—denies that deceased was of unsound mind, and alleges that for five years previous to his death he was of sound mind and memory, and capable of transacting business, and did transact all his business affairs, but admits that he was intemperate, and frequently intoxicated—denies that he ever induced deceased to come and live with him, but that deceased and his wife, complainant Margaret, not living together pleasantly, deceased requested appellant to permit him to come and live with him, to which appellant, on the earnest solicitations of the deceased, consented—alleges that on the day of the date of the note and mortgage, deceased was honestly indebted to appellant in the sum of eight hundred and twenty-seven dollars and seventy-five cents, " for a valuable consideration "—denies that deceased was of unsound mind and memory at the time of the execution of the instrument of writing—denies all purpose of cheating and defrauding complainants, or of delaying creditors of the estate, and avers that the note was given for a good and valuable consideration, received by the intestate from appellant.

On replication being filed, proofs were taken, and a decree

passed, making the injunction perpetual, and costs awarded against appellant. In the whole record, voluminous as it is, not a question of law is raised, and all we are called upon to decide is, does the evidence sustain the allegations of the bill? Was the deceased of unsound mind and memory when he made the note and mortgage? and was there any consideration moving from appellant to the deceased, for the note and mortgage?

Disposing of the first question affirmatively, will dispose of the case, for, if the intestate was not of sound mind and memory, at the time he executed these instruments, the question of consideration, or no consideration, is unimportant.

There is no pretense that the note and mortgage were executed whilst the party was in a state of intoxication, to such a degree as to be deprived, temporarily, of his reason. On the contrary, the proof is, by the magistrate who prepared the papers, and took the acknowledgment of the deed, that he heard the conversation between Keenan and Van Horn, and noticed no unsoundness of mind, and that Keenan was fully competent to transact the business. The bill does not proceed upon this ground, but on the ground that from a long and persistent use of intoxicating drinks, the mind of the grantor had become so weakened and diseased, as to make him an easy prey to any designing and artful person—to destroy, within him, all self-respect—all ideas of right and justice, and all ability to protect his own interests, or those of his family. There could be no doubt, if the deed was executed at a moment when the party was temporarily deprived of his reason, from drunkenness or any other cause, the deed would be void, for although a criminal act committed in a state of intoxication, is not excusable, and by the Roman law received a double punishment, one for the drunkenness, yet as to contracts, it is the uniform doctrine of courts of equity, and of some courts of law, that such a condition will avoid the contract. It is not sufficient, for this purpose, that the party is under undue excitement, simply from ardent spirits, it must rise to that degree which may be called excessive drunkenness, when the party is wholly deprived of his

reason and understanding. A less degree of drunkenness, which only darkens reason, has not the effect of annulling contracts. But when a person, although less positively *non compos*, or insane, is yet of such great weakness of mind as to be unable to guard himself against imposition, or to resist importunity or undue influence, no matter from what cause such weakness arises, whether from temporary illness, general mental imbecility, natural incapacity from infancy, the infirmity of extreme old age, or those incidental depressions which result from sudden fear or constitutional despondency, or overwhelming calamities. 1 Story's Eq. 231. Under any of these conditions, it is not to be supposed the party was in possession of mind sufficient to make a contract, disposing of important and valuable interests, and therefore might very easily be imposed upon. Ground is furnished, by such a condition of a party making a deed, from which the inference may be well drawn, and courts of equity will not be slow to draw it, that it was obtained by fraud or circumvention. A party in such a mental condition, is so greatly exposed to fraudulent designs, so powerless to escape them, and which he is too dull to suspect, that courts interpose to relieve, and on the ground of fraud.

But when a party, capable of taking care of his own interests, makes a bad or losing bargain, the law will not assist him, unless deceit has been practiced, against which ordinary prudence could not protect him. Whilst the capable and strong are protected against the wiles and deceit of the designing, the weak and incapable find protection in their infirmities, which though mournful to witness, are an effectual shield against imposition.

Was the intestate in either of these conditions of mind at the time he executed the note and mortgage? The evidence greatly conflicts on this question. We do not propose to comment on the whole of it. Some sixty witnesses give it as their opinion, that he was occasionally furious and insane, especially when in liquor, and that he was much of his time in that condition. Two of these witnesses profess to be physicians, and they say, his insanity was occasional only ; one of

them, Light, adds, he has seen Keenan when he did not think him sane, and at other times when he did not observe any mental aberration.  About forty witnesses on the other side, one of them the attending physician of the deceased, speak of him as a man capable at all times of attending to his business, when sober—that he was quite intelligent and reasonable.  We think the proof, on the whole, fails to show that Keenan was insane, or *non compos mentis*, at the time he executed the note and mortgage.  We do not think, under a commission *de lunatico inquirendo*, with a view to have a conservator appointed for him, that a jury would have found him, under this evidence, either " lunatic, insane or distracted person," incapable of managing his own affairs.  Such imbecility as would justify a jury, under such a commission, in putting his property and person in the care of a conservator, we think has not been shown.  But has any one of the conditions of mind, to which we have alluded, been manifested by Keenan, and has it been taken advantage of by Van Horn?  Does the nature of the act, or contract between these parties, justify the conclusion that Keenan was not in a condition of mind, when he executed the instruments, to exercise a deliberate judgment, but had been imposed upon or circumvented or overcome by cunning, or artifice, or undue influence?

Persons, other than medical men, no matter how intelligent they may be, are incapable of pronouncing on the true condition of mind of any one.  They are ignorant of the diagnosis of insanity or mental weakness; and so are physicians in general practice, for the most part.  No one who had made this branch of medical jurisprudence his special study, was examined in this case, and no judge ought to be satisfied with the crude opinions given by most of the witnesses.  We were not satisfied with them, and therefore sought the opinion of the eminent head of the Asylum for the Insane—one of those magnificent charities which the bounty of our State has provided, so much to her honor—and he has favored us with one. We do not concur in all the views he has presented.  He is of opinion, however, that the facts, if they do not make out a case of insanity, show one of the conditions of mind to which

we have adverted. If it be granted that Keenan was not actually insane, his ability to transact business was certainly questionable, and Van Horn's opportunity to perpetrate a fraud was most abundant, as he had him in his house, and had entered into bond for his peaceful behavior toward his family—was, in fact, his keeper or jailor—and where he had access to strong drink, as his brother James testifies, and was, one-half the time whilst there, under the influence of liquor. The testimony goes to show, that he was not merely crazed by a few drams, at intervals, but most of it shows that his mind was nearly wrecked, either by injuries received in his youth, of which the witness James Rea spoke, or by long habitual indulgence in stimulants, or by the operation of both causes. The eminent physician at the head of the asylum states, that "it is one of the peculiar phenomena of insanity, that it sometimes shows itself in an inordinate craving for liquor, usually coming on by 'spells,' or at intervals; and the insanity thus singularly exhibited is often originally produced by causes the most remote from any such immoral indulgence. Thus a man made insane by concussion of the brain from a fall, may show his insanity in what his neighbors regard as a beastly debauch, periodically indulged in. The occasional appearance of an inordinate appetite for stimulants, with a distaste for it during the intervals, is so universally regarded as a form of insanity by authors on the subject, as to have given the disease, under the name of *Dipsomania,* a distinct place in the nosology of mental diseases."

A portion of the testimony shows, that one peculiarity of Keenan's conduct was to place stones, blocks of wood, stakes, cornstalks, etc., in martial array, and give them the word of command, styling himself "Captain Rock"—another, to buy toys, confectionary, and such trifles, and give them away to children indiscriminately. On this last peculiarity Doctor McFarland remarks: "The drunkard, under ordinary circumstances, may become turbulent, hilarious or quarrelsome, when in his cups, but when he acts under some actual and always recurring delusion, such as the last, the soundness of his mind is to be *questioned.* Mere drunkenness is more *general* in its

hallucinations than insanity; its morbid impressions are more *scattered.* When a man in his drink, for instance, supposes himself a king, or, as in Keenan's case, a great military commander, and there is a well-known *fixedness* about that delusion, which everybody understands and expects to see developed every time he gets liquor, there is good ground for asserting that the brain is actually *diseased.* In this case, the liquor acts on the mind as a varnish acts on the native grain of wood—bringing into stronger relief what just as much existed before, but was not so fully apparent."

Upon the point, that much of the testimony shows that Keenan was like other men, when not under the influence of stimulants, the learned doctor remarks, that, " there are very few insane persons who do not, much of the time, talk like other men; and like other men, make shrewd bargains, show a strong and accurate memory, and do mechanical acts, quite properly and methodically. In any hospital or asylum for the insane, where large numbers are gathered, it is the exceptional *few,* who betray their condition, by *outre* language or acts. In a large proportion of the insane, the exterior manifestations of the disease, in any word or special act, are so imperfect, that continued, unbroken study of the subject of it, is required to enable one, exactly, to define in what the disease consists. A commission to visit hospitals, and liberate all those, who, at their visit, talked and acted like other men, would empty them of half their inhabitants. In very many, the subjects of their insanity, are entirely domestic, referring to their home relations, and never displayed abroad. We may justly fancy Keenan to be so affected by this mental and moral aberration as to regard his family as his enemies, and to think the claim of Van Horn, who gave shelter, food, and the means of supplying his dominant appetite, stronger than that of wife or child. Yet all this may have been consistent with a strain of proper talk, when his family interests did not come in. Hence, many persons who saw him trade, do work, or conversed with him on general topics, may have honestly believed him quite sane, and have so testified."

On this point, the testimony shows, that Keenan had been

lodged in jail, on the complaint of his wife, out of which he was bailed by Van Horn, and taken to his house, where he remained for nearly eighteen months, to the day of his death. It is in proof by one of Van Horn's witnesses, James F. Keenan, the brother of Patrick, that he continued to get worse while at Van Horn's, and appeared all the time whilst there to be under the influence of liquor. We would infer from this, and other portions of the testimony, that while at Van Horn's, he was not debarred the use of stimulants, though Van Horn may be innocent of the suspicion of furnishing them. It is in proof, Van Horn had more influence over him than any other person. It is also in proof, that he was not in any business, or in a position to owe or use the large sum for which the note and mortgage was given, nor is there any evidence how, or in what manner he became so largely indebted to Van Horn. In his answer, Van Horn fails to show the grounds of indebtedness, or to set out the consideration for which the note and mortgage were given. These circumstances force the mind to conclude, that though Keenan was neither insane, or lunatic or distracted, he was in such a mental condition as to deprive him of the free exercise of his reason, and quite open to any advances his friend and protector might make upon him. He was a person, who, from his general deportment, and well known idiosyncrasies, if not amounting to insanity, with whom a cautious and prudent man, having no bad purpose to effect, would be very unwilling to make a contract in the absence of witnesses, and without the ability to show, by clear testimony, that it was for a full consideration, the terms fairly understood, and not injurious to the party making it. That it was *bona fide* made for an honest purpose. We think these elements of a fair contract are wanting in this case. The one party appears from the evidence, if not insane, to possess but the shattered wreck of a mind. The other, a business man in the full possession of all his faculties, and who declines, when called upon in a court of chancery, to show by what means, and for what cause, he became the creditor in so large an amount, equal to the whole value of the property. The circumstances force the inference, that

advantage was taken by Van Horn, of Keenan's imbecile mental condition, who, it may be safely said, if not insane, was not a proper person to make a large contract. A court of equity, it is true, will not set aside a contract, from the simple fact that the intellectual capacity of one party to it, is below that of the average of mankind, unless fraud and deceit be proved, but it will do so, when all the facts and circumstances enforce the belief, that from imbecility of mind, one of the contracting parties has been circumvented or overcome by artifice or cunning, and from these infer fraud. But while weakness of understanding deserves and receives protection, it should be remembered that too nice an investigation of eccentricities and imperfections, may lead to great injustice. In this case it is not unjust to believe, from the testimony adduced, that while Keenan was at Van Horn's, liquor was always within his reach, or else withheld from him just sufficiently to keep him under Van Horn's control, just enough being used to keep in action his disregard of all his moral duties. His infirmity seems to have progressed, while at Van Horn's. His sense of the obligations due to his family became more and more blunted. From spending his means in trifles to give away indiscriminately, to children in whom he had no special interest, he ended very naturally in alienating all his property, without the color of an equivalent. He was then, physically, such a wreck, that his mind ceased to retain integrity sufficient to comprehend any moral obligation. In the absence of this sense it was, that the note and mortgage were executed, by which the proper inheritance of his children passed to a stranger.

We cannot but think, from all the facts in the case, that Keenan was not, at the time of the execution of the note and mortgage, of sound mind, and concur with the court below in the opinion, that they should be regarded as void, and Van Horn be perpetually enjoined from proceeding on them, seeking to recover thereon. We affirm the decree of the Circuit Court.

*Decree affirmed.*