[No. 8030.   Department One.   July 14, 1909.]

SADIE HATTIE *et al.*, *Appellants*, v. FRANK W. POTTER *et al.*,
*Respondents.*[1]

CANCELLATION OF INSTRUMENTS—FRAUD—UNDUE INFLUENCE—WANT OF CAPACITY—EVIDENCE—SUFFICIENCY. Fraud will be inferred and a deed set aside for want of capacity, where it appears that the grantor, an aged inmate of a charity hospital, upon inheriting an estate of the value of $20,000 through the death of his son, suffered a general break down and made voluntary conveyances of all the property to one heir to the exclusion of others, without any natural reason therefor, at a time when his mind was so weakened that he was peculiarly susceptible to influence, and he probably did not have sufficient intelligence to understand the nature of the transaction.

SAME—CONVEYANCE FROM PARENT TO CHILD—UNDUE INFLUENCE— BURDEN OF PROOF. When an aged parent conveys all his property to a daughter to the exclusion of other heirs, without any consideration for his future support, the burden of proof is upon the grantee to show by clear and convincing evidence that it was fair and fully understood by the grantor.

Appeal from a judgment of the superior court for Lincoln county, Warren, J., entered July 8, 1908, upon findings in favor of the defendants, in an action to set aside conveyances on the ground of fraud and want of capacity, after a trial before the court without a jury. Reversed.

*Wallace Dinsmore* and *Martin & Wilson*, for appellants.
*W. H. Carlin* and *Joseph Sessions*, for respondents.

MORRIS, J.—Orson Tucker died intestate in Lincoln county, Washington, on the 8th day of August, 1908, leaving sur-

[1]Reported in 102 Pac. 1023.

viving him his father, John J. Tucker, his sole heir, then an inmate of the Yuba county hospital, at Marysville, California. The property of Orson Tucker consisted of lands and personal property situate within Lincoln county, of the value of $20,000, now in the possession of John E. Frazer, his administrator. On August 15, 1906, John J. Tucker gave a power of attorney to Frank W. Potter, husband of his daughter Minnie Potter, being a general power of attorney as to all lands and property of the estate of Orson Tucker. Under this power of attorney Potter went to Lincoln county and procured the appointment of Frazer as administrator. On November 12, 1906, John J. Tucker gave a deed to his daughter Minnie Potter of all the Lincoln county lands descending to him as sole heir of his son Orson, and on the same day made an assignment to her of all his rights, title, and interests in and to the estate of his son Orson.

John J. Tucker died March 25, 1907, leaving surviving him his daughter Minnie Potter, and the minor appellants, children of two other daughters, now deceased; and thereafter this action was commenced on behalf of said minors to set aside said deed and assignment, upon the grounds of fraud, undue influence, and insufficient mental capacity. Upon issue being joined, trial was had, resulting in a decree sustaining the validity of these instruments, and this appeal.

As is usual in cases of this character, the evidence is somewhat conflicting, but we think it is established that John J. Tucker lost his wife about thirty-five years ago. He made no effort to maintain his family together but, leaving them in custody of others, he spent his time working upon ranches near Marysville. His only home, in so far as it can be said he had one, seems to have been with a bachelor friend named Shay, with whom he lived more or less for thirty-five years. He seems to have been a good worker, and to have commanded good wages until he began to fail physically; but nobody seems to know what became of the money he earned, unless he spent it in an occasional spree, which seems to have

been more or less of a habit with him when he visited Marysville. In addition to his wages, he received money from his mother's estate, but nobody seems to know how much, or what became of it. He continued to work as long as he was able, until, as Shay says, he "couldn't hold a saw any more," when Shay obtained a permit for him and he entered the county hospital as a charity inmate, on June 27, 1904, being at that time seventy-four years of age.

The details of his life at the hospital are naturally very meager, but he seems to have been what would ordinarily be expected of a man of his age and physical condition, until the death of his son, when, according to the testimony of the hospital steward, he had a "break-down," mentally and physically, and his entire condition and habit seem to have greatly changed. A few instances of this change are given: Before that time he used to peel potatoes each day in preparation for dinner; afterwards he either would or could not; at least he did not. Before the death of his son he was somewhat careful about his appearance; would be the first one to ask for clean clothes from the steward Sunday morning; afterwards he paid no attention to his clothes, and they would be taken to his bed. He did not seem to realize it was Sunday. He was in the habit of crying; would hold the hands of the steward and cling to him in a helpless manner. At bed time he would go to the operating room and other rooms, wandering around, and complain of being lost; would forget where he put his tobacco; complain of losing his money. He was somewhat deaf, and had lost the power of speech to some extent, so that it was difficult to understand him. Before his so-called breakdown, he is described as being quite talkative; afterwards he did not seem to want to talk. Before he went to the hospital he was very exact about his money matters; as his old friend Shay says: "He was very exact, that old man was; he wanted the last cent." After the son's death he seemed, the steward testified, to have no idea of money matters. A physician, to whom a

hypothetical question was propounded based upon his physical and mental condition as testified to by some of the witnesses, says the facts would indicate *senile dementia*.

This was the man from whom this power of attorney was obtained by his son-in-law shortly after the son's death, and by whom later on the deed and assignment were executed, transferring all his property without consideration to his daughter. Concerning the execution of these several papers there is no competent evidence that gives much history of them. We know little about them, except that they were executed. Hence we must depend largely upon all the facts and circumstances surrounding and in any wise reflecting upon the acts, to determine their character. In cases of this character it is not necessary to establish an absolute loss of mentality. Complainants do not have to prove the insanity of the grantor. It is sufficient to show that the mind was in such a weakened condition, from either mental or physical infirmities, that it could be found there was not sufficient intelligence to understand fully the nature and effect of the transaction complained of; or, if so, that the conveyance was executed under such circumstances that it ought not to be upheld, or as would justify the interference of equity for its cancellation; especially where, as in this case, we find allegations of fraud and undue influence imposed upon an old man seventy-seven years of age, conveying all his property to one heir to the exclusion of others, and leaving himself stripped of property of the value of $20,000, and continuing to be an inmate of a county poor house until his death. Such a transaction is upon its face of doubtful propriety, and justifies a careful scrutiny into its fairness. Such a man as the evidence shows John J. Tucker to have been at the time of the execution of these instruments could easily have been imposed upon; and the inference may well be drawn, and courts of equity will not be slow to draw it, that they were obtained by fraud or circumvention. A party in such a mental condition is easily exposed to fraudulent designs, so pow-

erless to escape them and too dull to suspect, that courts deem it their duty to interpose, and that upon the ground of fraud. *Van Horn v. Keenan*, 28 Ill. 445.

We can find in this record no natural reason for this old man's act. This daughter and her husband, who became the sole beneficiaries of these conveyances, had lived for two years in the same city. The husband was a merchant. They do not seem to have taken much interest in him until he became possessed of this property. The steward says he never saw the daughter at the hospital. The daughter says she was there once prior to the time she moved to Reno. Her husband admits on his direct examination that, prior to the time this property came to the old gentleman, he never went to see him; says he was too busy. On cross-examination, this fact being called to his attention, he says he did go to see him; thinks he might have dropped in when he was riding by; but he can give no time nor details of such visit. It is safe to assume they were never made. As soon as the brother dies, they become very much interested in the welfare of the father and the disposition of the property. We find the daughter interviewing her brother-in-law Hattie as to the disposition of Orson's property, and when Hattie suggested that the father would be the heir, she tells him, "the old man was childish and incapable of taking care of the property;" and this she does not deny, although she did deny other statements attributed to her by Hattie in that same conversation. As evidence that her husband was of the same opinion, we find him, after the execution of this deed and assignment, giving $10 to the steward to dole out to the old gentleman as he might need it. If the old gentleman was thought by Potter to be capable of caring for and managing his property interests, why not give him the money to spend as he himself might determine? The idea of the Potters seems to have been that the father was fully capable of dealing with property of the value of $20,000, when they were the beneficiaries of his act, but he could not properly handle

$10 when he himself was the beneficiary. During the two years this daughter lived at Marysville, we find no evidence of any little gifts of clothing and comforts, so useful and needful to a man living in such a place as the father, and so prone to be offered by those who have the ordinary affection of child for parent; but as soon as the old gentleman becomes possessed of the son's estate, when for the first time since he became an inmate of this county poor farm or hospital he was in a financial situation to administer to his needs and desires, we find the son-in-law Potter taking him down town and buying him some articles of apparel such as shirts, socks, suspenders, underwear, etc. Is it too much for a court of equity in such a case to say there is a presumption and inference of undue influence and fraud that must be rebutted by strong proof before a conveyance under such circumstances will be permitted to stand?

We can find little in the record of the circumstances directly surrounding the execution of these several instruments. All we know of the power of attorney is that it was prepared by Carlin, the attorney of Potter for fifteen years, within a day after Potter's return to Marysville, and that it was executed by John J. Tucker at the hospital. The witnesses to the instrument give it as their opinion that he was all right mentally at that time. Potter leaves for Washington to examine into the property left by Orson Tucker. The old gentleman in the meantime makes no allusions to this visit, or what was expected to result from it. It would be supposed that this would be such an epoch in the old gentleman's life that he would have mentioned it. It would not be strange to find some elation at the prospect of leaving this charity home, or some reference to his future conduct; but there is no mention of any of these things. It is not difficult to assume the reason was the old gentleman had no understanding nor conception of the situation. Upon Potter's return from Washington we find his attorney Carlin dic-

tating the deed and assignment, and the old gentleman being taken down town by Potter, who purchases some shirts and socks for him, and then the old gentleman enters Carlin's office alone and executes the deed and assignment. Potter did not accompany him, but it is not difficult to find that it was because of the suggestion and influence of Potter that he went there. And then Potter returns with him to the hospital, leaves $10 with the steward for his use, and, his mission being ended, departs for Reno. Two persons who were present in Carlin's office say the old gentleman said when entering that "he came to sign papers on request of Mr. Carlin." When or by whom this request was made the record is silent, but the strong inference and probability are that it was made by Potter, just before the visit was made.

At the time of the execution of these instruments John J. Tucker was not insane. Neither was he in such a state of mental imbecility as to render him entirely incapable of executing a valid deed; but the conclusion is to our minds irresistible that he was, by reason of his bodily infirmities, superinduced by the death of his son, in such a condition of mental weakness as to render him peculiarly susceptible to any influence which in his weakened mental condition he could neither meet nor combat. In such cases imposition or undue influence will be inferred. *Allnore v. Jewell*, 94 U. S. 506, 24 L. Ed. 260.

In the above case the court quotes from *Harding v. Wheaton*, reported in 2 Mason 378, as follows:

"Extreme weakness will raise an almost necessary presumption of imposition, even when it stops short of legal incapacity, and though a contract in the ordinary course of things, reasonably made with such a person, might be admitted to stand, yet if it should appear to be of such a nature as that such a person could not be capable of measuring its extent or importance, its reasonableness or its value, fully and fairly, it cannot be that the law is so much at variance with common sense as to uphold it."

The court continues:

"The same doctrine is announced in adjudged cases almost without number; and it may be stated as settled law, that whenever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or any other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a court of equity will upon proper and seasonable application of the injured party, his representatives or heirs, interfere and set the conveyance aside."

The consideration named in the deed was $10; that in the assignment was a "valuable consideration." It is admitted nothing was paid, and they are now claimed as voluntary gifts. We think the present case a proper one for the application of the principles above quoted. In the case of *Hunter v. McCammon*, 104 N. Y. Supp. 402, it is said, in speaking of a conveyance by a mother to her daughter, attacked on the ground of fraud:

"This situation imposed upon the defendant the burden of showing that the transaction was fair, open, voluntary, and well understood, where the relationship between the parties is that of parent and child, principal and agent, or where one party is situated so as to exercise a controlling influence over the will and conduct of another, transactions between them are scrutinized with extreme vigilance, and clear evidence is required that the transaction was understood and that there was no fraud, mistake or undue influence. Where those relations exist there must be clear proof of the integrity and fairness of the transaction or any instrument thus obtained will be set aside."

In *Croissant v. Beers*, 118 Ill. App. 502, the court uses this language:

"We hold the law to be that where an aged and infirm parent conveys substantially all his property to a child, without consideration, and without any contract to support, it is for the child to show that the conveyance was fair and reasonable."

12—54 WASH.

The respondents have not, in our opinion, met this burden. They have not convinced us that these transactions were open and fair and fully understood and appreciated by John J. Tucker.   They have failed to show any reason why this old and infirm man, who in his days of mental and physical vigor was shown to be exact, careful, and insistent to the last cent in his financial transactions, should give away all his property to one heir to the exclusion of the others, without any consideration for his future support and maintenance, without any provision for sufficient money to procure him the few bodily comforts and necessities he could not obtain in his charity home, and leave himself penniless and an inmate of this county hospital until his death.   It is too improbable, and no court ought to sustain such a conveyance without clear and convincing proof of its fairness and full appreciation and understanding of its consequences on the part of the grantor.   Not finding such evidence in this case, the judgment is reversed, and the case is remanded with instructions to the lower court to enter its judgment in conformity with the views herein expressed.

RUDKIN, C. J., GOSE, FULLERTON, and CHADWICK, JJ., concur.