[No. 10596.   Department Two.   April 28, 1913.]

*In the Matter of the Estate of* MARY JEFFS.[1]

WILLS — EXECUTION — CAPACITY — UNDUE INFLUENCE—EVIDENCE— SUFFICIENCY. Findings that, of several wills executed by an Indian woman, the first was entitled to probate as the only will speaking her free and uncontrolled mind, are sustained where it appears that such will expressed her wishes when she was uncontrolled by others, but after its execution her husband died, and she weakened materially in body and mind and made numerous and greatly varying dispositions of her property, readily yielding to and adopting any suggestions that were made to her, the last will being made two days before she was declared mentally incompetent.

Appeal from a judgment of the superior court for King county, Dykeman, J., entered February 17, 1912, establish-

[1]Reported in 131 Pac. 847.

ing and admitting a will to probate, after a hearing on the merits.   Affirmed.

*Walter S. Fulton, Bates, Peer & Peterson, Kenneth Mackintosh,* and *Arthur E. Griffin,* for appellants Milroy *et al.*

*Kerr & McCord,* for appellants Hart, Allen and Ankeny.

*Bogle, Graves, Merritt & Bogle,* for respondents.

MORRIS, J.—This is an appeal from a decree establishing and admitting to probate the last will of the deceased.   Mary Jeffs died in November, 1911.   Prior to her death she had executed four different wills, making different disposition of her estate.   Three of these wills were offered for probate, and upon a consolidated hearing, the court admitted to probate the will which was first in time.   Proponents of the other two wills have appealed.

In discussing these various wills, and in giving the reasons for the conclusions we have reached, we shall not attempt to refer to all the matters discussed by counsel for these various proponents.   No open-minded man can read the record submitted on this appeal without reaching the same conclusion as the court below, that the only will speaking the free and uncontrolled mind of Mary Jeffs was the one admitted to probate.   Without attempting to cover the matter in detail, it will be necessary to refer to the circumstances under which these four wills were made, and go somewhat into the history of the deceased.   Richard Jeffs was a pioneer rancher in the White River valley.   He was apparently a man of some force of character and business acumen, and at the time of his death, in 1908, had accumulated a large property of the probable value of nearly $300,000.   In his youth, and shortly after his advent into this new country, he married an Indian woman, and unlike some of the pioneers who did likewise, he did not put her aside with the coming of wealth and prosperity, but maintained his marital relation up to the time of his death.   This Indian woman was Mary Jeffs, the de-

ceased. Several children were born of this marriage, but all had died prior to July, 1907.

So far as the record discloses, Richard Jeffs had no relatives, and after the death of his youngest son, he sought to originate some plan whereby this large community estate should become a beneficial factor to future generations. In this wish it is evident he was joined by his wife, who while not differing from the average woman of her race, leaned upon the strong character of her husband and was upheld and encouraged by him, until the husband's wish became her own as to the beneficial use of their property. That this desire had obtained a strong hold on both Richard and Mary Jeffs, and was the result of much thought, is apparent from the fact that, as early as 1893, they executed wills with provisions for an orphans' home, contingent upon the prior death of the youngest son without issue. This son died in 1901, and, after his death, Richard Jeffs sought the advice of counsel as to the best way to accomplish the mutual desire of himself and wife as to the disposition of the property for the use and benefit of an orphanage. The matter was finally determined to their mutual satisfaction, and in July, 1907, two wills were drawn, each providing for the same orphanage, creating the same trust, nominating the same trustees, and providing for the joining of the two estates, after the death of both husband and wife, in one trust fund, the proceeds of which were to be used in the construction and maintenance of a home for orphan children resident in King county, "or in case King county is ever divided, then resident in the county in which the city of Seattle is situated," to be forever known as "The Jeffs Orphans' Home." Mary Jeffs' chief interest seemed to be centered in the idea that this home would not only be a memorial to herself and husband, but would be a monument to the memory of her youngest son, Alex.

While these two wills were drawn at the same time, they were executed on different days. Richard Jeffs executed his will on July 16, 1907. The will of Mary Jeffs was delivered

to her on the same day, but the attorney who drew the wills insisted that, before she executed it, she should have a clear understanding of its provisions; for this reason it was left at the home on the day the husband executed his will, in order that he might convey to her an explicit and thorough understanding of its terms, and two days later the three persons who had witnessed the execution of the husband's will appeared at the home and witnessed the execution of the wife's will. That at the time of its execution Mary Jeffs had as clear and comprehensive an understanding of the provisions of this will as it was possible with her limited knowledge to convey to her, cannot be doubted.

Richard Jeffs died the following February, and from that time Mary Jeffs, who was then nearly seventy years of age, became as variable as a leaf in the wind. In the language of respondents' brief: "She was left derelict upon an uncharted sea, and drifted with every current and was blown about by every adverse wind which she encountered." She seemed, in the death of her husband, to have lost the prop of her declining years, and weakened materially in both mind and body. She became more or less addicted to the use of intoxicants, and rapidly descended from her former condition until she became a weak, vacillating and decrepit old woman, giving heed to any plan as to the disposition of her property that might be suggested to her. With her mental powers so weakened as to furnish her no guide in the disposition of her affairs, she readily yielded herself to the wishes of those about her, one day adopting one suggestion as the result of a visit from one set of friends or relations, the next day agreeing with others upon a different disposition, again importuning old friends of her husband to aid her in extricating herself from her entanglements, and beseeching them to assist her in remaining steadfast to the original purpose of joining her estate with that of her husband in the erection and maintenance of the memorial orphanage.

On March 7, 1908, and within a month after the death of

her husband, Henry Sicade, who had married her daughter, then deceased, obtained a will from her in which, save for a few small legacies, aggregating $3,000, to relatives, she left him her entire estate. This will was produced and is filed as an exhibit in this record, although no one seemed willing to stand sponsor for it and ask for its probate. In this will she refers at length to the will of July 18, 1907, and repudiates it as having been made without a full comprehension and realization of its provisions. On May 12, 1909, she executed a deed to all her property to this same Henry Sicade, conveying property approximately of the value of $150,000, without any apparent consideration. On September 17, 1910, she repudiated this will and deed in which Sicade had been the chief beneficiary, and employed James Hart and Jay C. Allen as attorneys to commence a suit to obtain a reconveyance of the lands embraced in the deed, reciting that the deed had been obtained by fraud and misrepresentation; agreeing to grant to Hart and Allen an undivided one-half of all the property reconveyed to her, as compensation for their legal services. On September 22, 1910, she executes her third will, in which she bequeaths $5,000 to the sister to whom she had bequeathed $500 in the Sicade will, makes no mention of the nieces to whom she had bequeathed $500 each in the Sicade will, and for the first time mentions a friend, Greta Lund, who had been staying with her for some time prior, to whom she bequeathed $5,000, and the entire residue of her estate she devises to James Hart, Jay C. Allen and R. V. Ankeny, in trust, the income of the trust estate to be united with that arising from the estate of Richard Jeffs in the maintenance of the Jeffs Orphans' Home.

On September 28, 1910, a few days subsequent to the making of the Hart and Allen will and the making of the contract to divide her estate with them in consideration of their services in obtaining a reconveyance of the property conveyed to Sicade, which conveyance she recites was through the fraud and misrepresentation of Sicade, she is visited by a number

of old settlers to whom she recites her troubles, and repudi-
ating her action of the previous week, she affirms her inten-
tion of abandoning the Sicade suit, and, on the same day
enters into an agreement with Sicade in which she recites that
there had been ample consideration for her deed to him, and
that she in all things confirmed and ratified the same, and
providing further that he should pay her the net proceeds
of the property during her life, and at her death convey about
forty-three acres of the land to Ella Steve, a niece, now men-
tioned for the first time as the recipient of her bounty, and
within two years after her death pay to her sister $5,000,
and $500 to each of three nieces now mentioned for the first
time. On October 31 following, Hart and Greta Lund again
visit her, and she makes an affidavit entitled in the suit against
Sicade, to recover back her property, in which she recites the
never-ending importunities of Sicade and his wife, and how,
yielding to these importunities, she had made the second will
and agreement of September 28, and again returns to her re-
pudiation of Sicade.

The next chapter in the history of this greatly perplexed
old woman is written at Tacoma, where, after having been
visited by attorneys representing friends and relatives, who
seek to save her from other designing friends and relatives,
she, on March 28, 1911, appears at the office of Bates, Peer
& Peterson and executes a fourth will, in which she gives
three-fourths of her estate to her sister Elizabeth Milroy,
with remainder, if any at the death of Elizabeth Milroy, to a
niece Ella Steve. The remaining one-fourth is divided among
four nieces, share and share alike. Pending the first visit
of these attorneys to Mary Jeffs and the making of this fourth
will, these attorneys filed a petition in the superior court of
King county, in which Elizabeth Milroy, as petitioner, prayed
the court for the appointment of a guardian for the person
and estate of Mary Jeffs, reciting in the petition that Mary
Jeffs was "childish and in such a condition of health and mind
that she is easily influenced and persuaded, and is by reason

thereof unable and incompetent to manage her estate and business affairs." The hearing of this petition was set for March 30, and on that day the superior court of King county entered its decree declaring Mary Jeffs mentally incompetent to care for and manage her affairs, and appointing James Bothwell and Jerry Meeker her guardians. It is significant that March 30 was two days subsequent to the day on which Mary Jeffs appeared at Tacoma and executed her fourth will.

Reference might be made to the testimony of witnesses, some of whom Mary Jeffs sent for and besought their aid, as we have before referred to, and to whom, after all these various happenings, she reiterated that it was her wish, when freed from the importuning and beseeching of her friends, that her property should go as intended by her husband and herself at the time they executed the wills of July, 1907. But it does not seem necessary to recite other facts to justify the conclusion that either Mary Jeffs' mind was weakened below the point of testamentary capacity, or that she was, for some mental or physical reason, so susceptible to influence that her desire and wish was always the desire and wish of the last one to converse with her. It is too plain for argument that her mind was in such weakened condition, from either mental or physical infirmities, that she did not have, at any time subsequent to the death of her husband, sufficient intelligence to understand fully the nature and effect of these various transactions; or else, understanding them, had lost the mental power to resist the importunities of those who sought to profit from her situation. Either conclusion is sufficient to justify the judgment of the lower court that the only will that could be held to have been the free and voluntary act of Mary Jeffs was the one of July 18, 1907. *Hattie v. Potter*, 54 Wash. 170, 102 Pac. 1023.

The judgment is sustained.

CROW, C. J., MAIN, ELLIS, and FULLERTON, JJ., concur.