[No. 21306. Department One. January 17, 1929.]

E. J. HACKETT, as *Administrator, Appellant,* v. JOHN WHITLEY, *et al., Respondents.*[1]

*S. A. Gagliardi* and *Bates & Peterson,* for appellant.
*Wm. C. Eatough* and *Henderson, Carnahan & Thompson,* for respondents.

HOLCOMB, J.—Appellant brought this action against the respondents to recover specific personal property, to wit: twenty shares of Puget Sound Power & Light

[1] Reported in 273 Pac. 752.

Co., preferred stock, of the par value of two thousand dollars, which respondents received from appellant's decedent prior to his death. It was also alleged that, in addition to the stock itself, a dividend of $70 had accrued and was payable. There was an alternative prayer that, in case the personal property could not be recovered, judgment be granted in favor of appellant for the value of the stock and the accrued dividend in the sum of two thousand and seventy dollars.

The cause of action upon which the recovery was demanded was that decedent was of advanced years, feeble in mind, and unable to understand the transaction which he was entering into with respondent; that the stock was obtained by undue influence and fraud, and that there was no consideration.

Being an action for recovery of specific personal property, or the value thereof, the court properly granted a demand for a jury, and denied the motion of respondents to refuse a jury upon the ground that the action was one equitable in its nature.

At the conclusion of evidence for appellant, however, without requiring respondents to produce any evidence to refute that of appellant, upon motion of respondents, the court dismissed the action on the ground that appellant had failed to furnish any proof of incompetency of the decedent to make the transaction; had failed to establish any undue influence; and that there was an entire failure of proof.

The case is before us, therefore, upon the evidence of appellant, and all presumptions must be indulged in favor thereof. We shall not recite the evidence in elaborate detail, but summarize only what appear to us to be the important and controlling facts.

Respondent John Whitley was an employee of the Puget Sound Power & Light Company, and had sold to Ish the twenty shares of preferred stock of that

company, then of the value of eighty-six dollars per share. On March 8, 1927, Ish delivered to respondent John Whitley, at the office of the company, the twenty shares of stock which he had purchased. On March 29, 1927, the parties visited an attorney in Puyallup, Mr. Eatough, whom appellant calls attorney for Whitley—but which the record does not sustain, there being no evidence that Eatough was then, or had been previously, the attorney for either party. They then caused him to prepare the following contract in writing:

"THIS INDENTURE made and entered into this 29th day of March, 1927, by and between George Ish, hereinafter called the seller, and John Whitley and Esther L. Whitley, husband and wife, hereinafter called the buyers, of Orting, State of Washington, Witnesseth:

"Whereas, George Ish is a man advanced in years and contemplates a journey which will take him away from his friends and acquaintances and relatives,

"And Whereas, he has during years past received many favors at the hands of said buyers,

"Now THEREFORE, said seller for and in consideration of the premises and of the covenants and agreements hereinafter contained, has bargained and sold and by these presents does grant and convey unto said buyers their heirs, executors, administrators and assigns, twenty shares of preferred stock of the Puget Sound Power and Light Company, of the par value of $100 (One Hundred Dollars) each, which said seller has heretofore authorized said buyers to have transferred on the books of said Puget Sound Power and Light Company to said buyers.

"To HAVE AND TO HOLD the same unto said buyers, their heirs, executors, administrators and assigns forever.

"And in consideration of said transfer of said property, said buyers covenant and agree to pay to said seller during the period of his natural life any and all returns which may be received upon the said stock from the Puget Sound Power and Light Company at interest or dividends thereon.

"Upon the death of said seller, said buyers agree to take charge of his funeral and to defray all reasonable funeral expenses and for burial.

"In the event of the illness of said seller so that he may require aid, upon notification to said buyers, said buyers agree to immediately render said seller whatever assistance he may require.

"Upon the death and burial of said seller, said buyers agree to cause to be inscribed upon his tombstone, his name and whatever other data may be subsequently hereto requested by said seller.

"This conveyance is made freely and voluntarily and as his free and voluntary act and deed and of his own free accord by said seller uninfluenced by any acts of said buyers.

"IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals this 29th day of March, 1927."

The contract was acknowledged by the parties before Mr. Eatough, as notary. Ish died three days after the contract was executed, on April 2, 1927, at his residence in Orting, Washington. He was found dead in his back yard. Within two hours after his death, respondents took possession of all the assets of decedent, entered his home and took possession of the property. This they claimed the right to do by reason of having purchased, for the sum of twelve hundred dollars, the premises where decedent lived, which included two houses and three and a half lots in Orting, of the value of two thousand dollars, and the personal property and effects belonging to Ish. The real estate was reconveyed to the administrator by respondents shortly after the administrator was appointed, but the redelivery of the stock was refused by respondent because of the contract herein set out.

At the time of the death of Ish, he was seventy-nine years old and, for about twenty-five years prior thereto, had been living in Orting alone, his wife having

died in 1901. His only relative and heir at law was his daughter, Della Wyckoff, who lived with her husband in Idaho on a wheat ranch. She was compelled to live in a higher and drier altitude because of being afflicted with tuberculosis. She, however, maintained cordial and friendly relations with her father, and had been visiting him yearly, and sometimes twice a year, during the preceding six or seven years. During the previous fall and winter, she had visited him for three months, having left him in January before his death in April. She generally visited him from two to three months, and sometimes longer.

Decedent was a disabled war veteran and had a compensation allowance from the government of $65 a month, and had other rentals and interest coming in, amounting to $413 per annum. In all, he had an income of approximately $1400 per annum. At the time of his death he had cash in safety deposit boxes in the sum of $6340. He also had $413 in cash on his person. His real estate in Orting was of the value of about $2,000.

Prior to 1926, Ish had been in good health and was keen-minded and thrifty. In 1926 his health began to fail and he failed rapidly, mentally and physically. When his daughter visited him in October, 1926, he weighed 185 pounds, but in January, 1927, he had reduced in weight to 160 pounds. Prior to 1926, he was a man of neat appearance and well kept. In 1926 he began to get slow and sluggish and became neglectful of his food, his clothes and his personal cleanliness. He began to exhibit filthy habits of slobbering upon his clothes, and neglected his food. He insisted on living mostly upon cold potatoes, spoiled sauer kraut, mildewed apples, corn meal with bugs in it, and generally spoiled food.

534

Prior to 1926 he was not known to drink. During 1926 and 1927 he drank moonshine heavily every day, sometimes to the extent that he could hardly control his voice or talk. He had liquor by the jug and drank it every day. Prior to 1926 he had been fond of children. During that year he became annoyed at children, and claimed that they were put up to annoy him by their parents. He had illusions that his neighbors were trying to persecute him and to drive him out of town. During that year he began to ramble in his conversation, it being disconnected and irritable, and he displayed considerable loss of memory. During that year he offered a man, who had been acquainted with him since 1889 and was an intimate friend with whom he went out hunting and fishing nearly every year, his property without any price. This friend noticed, about a year and a half before Ish's death, while on a fishing trip, that Ish was failing physically and mentally very fast. To another friend who had known him about twenty years, Ish offered his property for two hundred dollars, which she refused because of his mental incapacity. Another witness testified that Ish formerly played cards with her and others, but at the last he was not able to play cards because his mental faculties were not functioning; that he was forgetful and nervous. There was also testimony that he said that the people in his neighborhood were all plotting against him and were after his money, that even the banks were going broke, that he was going to take his money, dig a hole by the river and hide it and then take a trip around the United States.

A witness who had known him longest of any of the witnesses produced, thirty-five years, and who had hunted with him nearly every year, usually for a week at a time, testified that Ish was a man of fair practical education; that the first change he noticed

in the mental condition of Ish was in July, 1926; that his conversation then was disconnected; he could not remember well; would tell things over two or three times and then tell the same thing over again on several occasions. This witness saw him last in December prior to his death. At that time the witness visited Ish at his house, and the daughter, Mrs. Wyckoff, was there. She went out in the kitchen and Ish bent down, looked around to see if he was observed, and said, "By God, they are plotting against me right now." Before that he had always spoken well of his daughter. At that time his physical and mental condition were not very good. This change had taken place and was progressing very rapidly.

Prior to that last year, Ish was a capable man, but that last year he was unable to do business. There was also testimony that, from Christmas to the time of his death, Ish grew worse and feebler all the time. There was testimony that at the last he talked foolishly; talked "like a kid." There was evidence that the Whitleys were at Ish's house frequently, especially for about two weeks prior to his death. They were seen there several times during the evenings. Previous to two weeks before, they had not been noticed at Ish's frequently.

All of the witnesses who showed familiarity with Ish's life and habits, for periods ranging from about a year to about thirty-five years, and were familiar with his habits previous to a year, or a year and a half, before his death, and testified to his habits and change of habits, appearance and conduct, testified to the effect that during the last year, or during the last few months of his life, Ish was unable to do business of any consequence.

Upon these testimonial facts made by the nonexpert witnesses, a nine-page hypothetical question was pro-

pounded to Dr. Keller, as an expert of great experience in mental diseases, formerly superintendent of the Washington State Hospital at Steilacoom for eight years, who testified upon the question embodying the testimony of the witnesses as above outlined (with some omitted by us), that a man in the condition described was incompetent to do business, being afflicted with senile dementia. He testified that men advanced in years return to the condition of children and their minds fail rapidly. He also testified that the use of intoxicating liquor, as described, naturally expedites the deterioration. It was his opinion that the man described in the hypothetical question was mentally incompetent to do business.

The case is not before us as a case fully tried upon the facts. Hence, this is not such a case as *Clum v. Barkley,* 20 Wash. 103, 54 Pac. 962, which case was here, upon all the evidence, upon findings made by the trial court, against which there was no preponderance and this court affirmed. Nor is it like *Ford v. Jones,* 22 Wash. 111, 60 Pac. 48, another case where, upon all the facts, the trial court found that, at the time of the making and delivery of a deed, the grantor was of sound and disposing mind, that the grantees had not procured it by any undue influence and that the deed was made and delivered upon good and valuable consideration. There being no preponderance of evidence against the findings, this court affirmed the lower court.

Nor is this case similar to *Alexander v. Lewes,* 104 Wash. 32, 175 Pac. 572, which was also here upon findings of the trial court, after a full trial on the merits, in favor of the defendants in a suit by the grantee under a contract to convey by will. In that case there was evidence of an agreement to devise to a son-in-law property worth twelve thousand dollars, in con-

sideration of life support for the testator, who was eighty-three years of age, together with an assignment of the son-in-law's life insurance, which was supported by evidence of previous benefits received which were acknowledged in the will, and was coupled with the execution of the will and delivery of the contract for support. We held that the contract was entered into without undue influence on the part of the grantee, and that there was ample consideration to support the contract. In that case there was no question that the grantor was fully competent to transact business at the time of the alleged contract. Nor was there any such difference between the property agreed to be conveyed and the services expected to be received by the grantor, if the grantor was *sui juris,* as he was, to establish inadequacy of consideration.

*Howland v. Day,* 125 Wash. 480, 216 Pac. 864, cited and relied upon by respondents, was another case fully tried upon the merits, findings being made in favor of defendants, in which the action was, according to the usual form, dismissed; but both sides were heard.

Neither is this case like some, cited by appellant, where the complaint for recovery rested upon some undue influence on the part of near relatives or others acquiring some kind of influence or position of trust with the grantor. *Storey v. Gaisford,* 136 Wash. 378, 240 Pac. 9, is a case where the burden was upon the grantee, as such a fiduciary, from the start, to sustain the good faith of the transaction in controversy. So, also, was the case of *In re Hildebrand's Estate,* 140 Wash. 212, 248 Pac. 390.

*Perry v. Wetzel,* 122 Wash. 129, 210 Pac. 362, was a case, not against the kinsmen of the grantor, but one where the grantee had acquired influence over the mind of the grantor, a bachelor seventy-two years of age and of failing mentality. In that case it appeared

that the grantor had become insane at the time of the conveyances and that, regardless of his mental incapacity, the conveyances were obtained by undue influence.

But when mental incapacity at and about the time of the gift or transfer of the property is shown, then a presumption arises against the validity of the transaction, and the burden of proof rests upon the party claiming the benefit of the conveyance or contract to show its perfect fairness and the capacity of the other party. 2 Pomeroy's Equity Jurisprudence (3rd ed.), § 947.

" 'Extreme weakness will raise an almost necessary presumption of imposition, even when it stops short of legal incapacity, and though a contract in the ordinary course of things, reasonably made with such a person, might be admitted to stand, yet if it should appear to be of such a nature as that such a person could not be capable of measuring its extent or importance, its reasonableness or its value, fully and fairly, it cannot be that the law is so much at variance with common sense as to uphold it.

" 'It may be stated as settled law, that whenever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or any other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a court of equity will upon proper and seasonable application of the injured party, his representatives or heirs, interfere and set the conveyance aside.' "

The above was quoted approvingly by this court in *Hattie v. Potter,* 54 Wash. 170, 102 Pac. 1023. In the *Hattie* case, the conveyance was procured by a near relative of the grantor, a man seventy-seven years old. At that time the grantor was not insane, nor in such a state of mental imbecility as to render him entirely incapable. He was at the time an inmate of an asylum

for the poor. A recital, for which we refer to the decision, of the habits, conduct and appearance of the grantor, before and after his alleged incompetency set in, and his condition at the time of the execution of the instrument in question, tended no more to show incompetency than those shown in this case. We held in that case that a party in such a condition of mental weakness is easily exposed to fraudulent designs, so powerless to escape them and so dull to suspect, that courts deem it their duty to interpose, and that upon the ground of fraud. We also held that, in such cases, it is not necessary to establish an absolute loss of mentality; that complainants do not have to prove the insanity of the grantor; that it is sufficient to show that the mind was in such a weakened condition, from either mental or physical infirmities, that it could be found that there was not sufficient intelligence to understand fully the nature and effect of the transaction complained of; that in such cases undue influence will be inferred.

A case between a grantor and a stranger decided by this court is *Kennedy v. Currie,* 3 Wash. 442, 28 Pac. 1028, where the grantor, an old gentleman of seventy-five years, sick in mind and body, had given a deed to Currie of all his real estate. In passing upon the case, Judge Dunbar, with his usual rugged directness, said:

"But the most inequitable feature of this case is, that Kennedy was without any security for the enforcement of his contract. As hard as this character of contracts generally are, they are almost universally made on the supposition that the title does not pass until the conditions are fulfilled. In this instance, either Kennedy's contention is true, that he was misled and deceived as to the full import of the deed of conveyance, or the other theory must obtain, that he was not competent to attend to business . . . And

what did he get in return? Not a lien on the land for the faithful performance of the trust, but a written statement of Currie, a stranger, that he would take care of him while he lived. . . . Under this arrangement the defendants could sell off every foot of the land the next day after the deed was executed; in fact, it is admitted that several acres of the land have already been sold, and the old man, if this conveyance were held good, instead of having a valuable tract of land to rely on for his support, would be relegated by the law to Currie's generosity."

Under the contract for the sale of the stock in this case, Ish had no security that respondents would perform their agreement. It was necessary for him to rely upon their bare word.

There are cases which hold that such a contract, if properly executed, might be upheld if the consideration were thought to be adequate. As in the *Alexander* case, *supra,* a court should not weigh too carefully the price paid by the aged for home comforts and thoughtful ministrations. *McKnatt v. McKnatt,* 10 Del. Ch. 392, 93 Atl. 367. See, also, *White v. Johnson,* 4 Wash. 113, 29 Pac. 932. In that case, where the grantee was a stranger to the blood, also written by Judge Dunbar, it was observed:

"When a strong, competent man makes a contract of this kind with a man concerning whose mental capacity there is any question (and he is not liable to make such a contract with any other kind of a man), it is not too much for a court of equity to place the burden upon him to clearly show that the transaction was not tainted with fraud."

There are courts which hold that the mental capacity required to sustain the validity of a deed or contract is of a higher degree than that required of a testator to make a will. *Greene v. Maxwell,* 251 Ill. 335, 96 N. E. 227, 36 L. R. A. (N. S.) 418; *Jones v. Thomas,* 218 Mo. 508, 117 S. W. 1177.

In the *Greene* case, the supreme court observed that, for the purpose of making a will:

"It is sufficient for the testator to understand the business in which he is engaged, his property, the natural objects of his bounty, and the distribution he desires to make of his property. To sustain a deed, however, he must have the ability to transact ordinary business . . . in ordinary business transactions are involved a contest of judgment, reason, and experience, and the exercise of mental powers not necessary in the testamentary disposition of property. Mental strength to compete with an antagonist, and understanding to protect his own interest, are essential in the transaction of ordinary business."

In the instant case there was evidence ample to make a *prima facie* case, requiring rebuttal by respondents, that at the time of the transaction in question Ish, the grantor, was not competent to transact ordinary business. If that be true, the presumption then arises that respondents in some way unduly influenced their grantor and obtained the contract and property by fraud. We are not saying, of course, that such are the facts. We are simply saying there was a case for the jury.

And if the contract should be rescinded and the stock returned, no loss occurs to respondents other than the loss of benefit of the bargain. *Nystrom v. Thornton,* 136 Wash. 659, 241 Pac. 296.

The judgment is reversed, and remanded with instruction to reinstate the case and for further proceedings in accordance with this opinion.

MITCHELL, C. J., FULLERTON, TOLMAN, and BEALS, JJ., concur.