(No. 13698.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. FRANK LOWHONE, Plaintiff in Error.

*Opinion filed February 15, 1921.*

1. CRIMINAL LAW—*what is not, in itself, evidence of insanity.* The facts that the defendant in a criminal case is a man of depraved character and abandoned habits and that he has committed an atrocious crime are not in themselves evidence that he is insane.

2. SAME—*when People may prove that defendant has committed other crimes.* In a murder trial, where evidence has been introduced by the defendant tending to show that he was insane, and to establish that he has insane delusions proof is made of statements by him to the effect that he had committed certain other crimes, the People may show, without proving the details, that the defendant did, in fact, commit the crimes he talked about.

3. SAME—*what is not ground for sustaining challenge to the array.* The mere fact that the sheriff who summoned the regular panel is a witness for the People is not ground for challenge to the array, where there is nothing tending to show any misconduct by him in any way, as substantial rights must be impaired to constitute error in overruling a challenge to the array.

4. SAME—*expert's opinion as to sanity may be based on all the evidence.* In a criminal case an expert medical witness who is called upon to express an opinion as to the defendant's sanity may base his opinion upon all the evidence in the case, including the facts detailed by lay witnesses, and upon the examination of the defendant which the witness has made.

5. SAME—*what improper testimony will not reverse.* Permitting a witness in a murder trial to state that the deceased left four children is not error requiring a reversal, where the statement of the witness is stricken out by the court and there is evidence in the record, admitted without objection, that the deceased had been living on a farm with his wife and children.

WRIT OF ERROR to the Circuit Court of White county; the Hon. CHARLES H. MILLER, Judge, presiding.

F. M. PARISH, and IVAN A. ELLIOTT, for plaintiff in error.

EDW. J. BRUNDAGE, Attorney General, JOE A. PEARCE, State's. Attorney, and GEORGE C. DIXON, (CHARLES T. RANDOLPH, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Frank. Lowhone was indicted in the circuit court of White county for the murder of Mack Nottingham. He has been twice tried in that court and in both trials there was a verdict of guilty and sentence of death. The record of the second trial is now before this court for review on writ of error.

This court reviewed the record of the first trial, reversed the judgment and remanded the cause for further trial for the reasons stated in *People* v. *Lowhone,* 292 Ill. 32. We refer to that decision for a full and comprehensive statement of the facts presented in that record. Substantially the same evidence by the same witnesses was introduced on the second trial by both parties as was introduced on the first trial. Additional evidence was introduced by plaintiff in error, who will be referred to as defendant, substantially as follows:

Two Benton witnesses testified who did not testify in the first trial, their testimony being of the same character as that given by the other Benton witnesses. Another Carmi witness testified that two or three days prior to the shooting the defendant told him that he wanted to move back to Carmi; that a lot of sons of bitches around there had it in for him; and he apologized to the witness for having given him a cursing and said he was drunk, and asked him if he would treat him right if he moved back. The witness had no recollection of his ever having cursed or abused him. It was also proved that about forty minutes before the shooting the defendant met in Carmi Judge Endicott, the former county judge of White county, and told him that he must have protection; that he had been

on a drunk there two or three years before, had cursed and abused his wife and his mother and called them vile names, and that the people there were down on him for that reason. Judge Endicott further testified that he had never heard of the defendant getting drunk and cursing and abusing his wife and mother or that the people there were down on him for that reason, and that if he was sincere and believed in the truth of those statements it was his opinion that he was insane. An ex-policeman of Carmi testified that a few years before the trial defendant told him that there were some people there who were hostile to him and that he was afraid they would "get him" and asked witness to go with him to his home across the river for protection, and that he did go with him to his home on four or five different nights, as requested; that he knew nothing about the truth of the defendant's statements to him. It was also proved by two witnesses that when the court was about to sentence him on the former trial the defendant stated to the court that he did not have murder in his heart when he shot Nottingham and they were good friends; that Nottingham had been fooling around his house at night or eavesdropping and that he was afraid of him; that as he was passing Nottingham on the morning of the shooting Nottingham said something to him and that he jumped and began shooting at him, and that he was not himself and did not know what he was doing. What Nottingham said to him does not appear in this record. He also further told the court that he had theretofore killed a man by the name of Shores, and gave some of the details of the killing and why he killed him, which are not stated in the record. He also further stated that he had shot a negro in Carmi by the name of Lee Bush and gave the details of the shooting. One of these two witnesses testified that he only knew from hearsay about the defendant having killed Shores but did know about his shooting Lee Bush, and that his statement about that shooting was true. The sheriff of

White county testified for the defense that the wife of the defendant called him on the phone from Benton about two days before the shooting of Nottingham and told him that the defendant had run off from her and had gone to Carmi and asked him to arrest defendant for that reason.

Dr. George A. Zeller, a graduate of the medical college of Washington University, at St. Louis, testified that he had made a specialty of diseases of the mind and had been associated with the care of the insane for twenty years in this State. He was superintendent of the Peoria State Hospital for a number of years and since 1913 has been superintendent of the Alton State Hospital. Basing his opinion upon the testimony of the lay witnesses for the defense bearing on the question of insanity and on his personal examination of the defendant, he gave it as his judgment that defendant was afflicted with paranoiac delusions at the time he killed Nottingham. His conclusion was that these delusions had rendered defendant incapable of resisting certain impulses to do violence to Nottingham. Paranoiacs sometimes have irresistible impulses to do bodily injury to others. On cross-examination he stated that he would have to persist in the belief that defendant was a paranoiac if the various acts that he had heard the witnesses detail were not explained; that if twenty-five or thirty witnesses who were intimately acquainted with him for years, some of whom were his employers and others fellow-workers and neighbors, should testify that they had observed him during those years, extending up to the very time of the trial, and had never heard him speak a word or do any act that indicated to them that he was insane, he would have to modify his views as to his mental condition but would still be unable to explain his repeated and unlawful acts as related on the trial. He referred to the killing of Shores and the shooting of the negro by the defendant and his subsequently having been paroled on conditions that would incur his return to prison, and his voluntary violation of those

conditions. He further stated that if it should develop that the people of Carmi did actually have it in for him and that there was a justifiable feeling against him, his expressed opinion on that subject would not be a delusion. He stated positively that paranoia is a progressive disease and generally considered incurable. It grows worse all of the time and is a settled and fixed condition of the mind. He further testified that he could not say positively, but that he inferred from the testimony of the witnesses and his examination, that the defendant was unable to resist the impulse to shoot Nottingham on April 4 and that he was not able to know that it was wrong to do so, and that he based his diagnosis mostly upon the delusions of the defendant related by the witnesses. He did not think that it was an unusual circumstance that the defendant entertained delusions that other parties were trying to injure himself and also his brother Tom, as paranoiacs have delusions that certain persons are disposed to do injury not only to them but also to other members of their families.

Dr. J. L. Harrel is a graduate of the medical college of St. Louis, Missouri, and had charge of the Chester State Hospital for the criminal insane for two years. He had known the defendant slightly for a number of years but was never very well acquainted with him. He examined him recently while in jail and heard the various witnesses for the defendant testify to symptoms and occurrences indicating insanity. Basing his judgment on his examination and on the testimony, he gave it as his judgment that he is a paranoiac, and stated that paranoia is a protracted disease and the patient grows worse as time goes on, and that he does not understand that a patient will ever recover from it. He did not talk to the defendant very long when he examined him. He also testified that if twenty-five or thirty witnesses who had known the defendant for years, who were his employers or co-workers and associates, should testify that they never at any time noticed anything wrong

with him, he would change his notion to a degree, depending upon how much they knew about him, but would still say that he was insane and a paranoiac. He stated further that if the defendant recovered from his delusions he did not have paranoia.

Thirty-six witnesses testified in rebuttal upon the question of the sanity of the defendant, many of them being witnesses who did not testify on the first trial. The defendant was incarcerated in jail in Carmi for eight months or more after the killing and thereafter was removed to the Belleville jail, in St. Clair county, where he was imprisoned for about four months before the second trial. Dr. Rudolph Heiligenstein is a physician and surgeon and a graduate of Loyola University, Chicago, and county physician of St. Clair county. He had opportunity to, and did, observe and talk to the defendant during the four months he was in the Belleville jail and was able to see him every day. From his observation and conversations with him he considered him sane, and stated that he never observed anything or heard the defendant say a word or do an act during that time which caused him to think that he was afflicted with any unsoundness of mind. The jailer of the Belleville jail had opportunity to observe and talk with the defendant during the time he was at the jail, six or eight times a day, and from such observation and conversations with the defendant he testified that he was sane and that he never at any time saw him do an act or say a word that caused him to think him of unsound mind. The sheriff of White county, the deputy sheriff, two jail guards of the White county jail and the janitor of the court house observed him and talked with him frequently during the time he was incarcerated in the jail at Carmi, and all of them gave it as their judgment that he was of sound mind during that time. All of them except the sheriff further testified that in that time they did not hear him say anything or do anything that indicated that he was of unsound mind.

Twenty-seven other witnesses, residents of Carmi and of
White county, consisting of merchants, farmers, laborers
and officers, testified that they had known the defendant
and were well acquainted with him for a number of years
before he left Carmi for Benton, in October, 1918. From
their acquaintance and associations and conversations with
him they gave it as their judgment that he was of sound
mind. Many of them stated that they had never heard
him say a word or do any act that induced them to believe
that he was afflicted with insanity, and many of them gave
it as their judgment that during all of their acquaintance
with him he was able to know right from wrong and to
know that it was wrong to shoot a man without just pro-
vocation. Two of the twenty-seven witnesses saw the de-
fendant and talked with him not over thirty-five or forty
minutes prior to the shooting. From their observations of
him and conversations with him at that time it was their
judgment that he was of sound mind, and that they did
not at that time hear him say a word or do anything that
indicated that he was of unsound mind. The deputy county
clerk testified that he had the opportunity to observe him
and to hear him talk to the court on the last day of the
first trial. Basing his judgment on his conversation and
his observation of him on that day it was his judgment
that he was then sane and possessed of sufficient intelligence
and judgment to know that it was wrong to shoot a man.
He had not known him prior to the killing.

Dr. Anderson, who was six years managing officer of
the Chester State Hospital for the criminal insane and man-
aging officer of the State Hospital for the Insane at Anna,
Illinois, testified that from an examination made of the de-
fendant just before the second trial and from the testimony
of the lay witnesses bearing on the question of the sanity
of the defendant he believed the defendant was sane and
not afflicted with any delusions of the mind or any form
of insanity; that he was able to know on the day of the

shooting that it was wrong to shoot a man without just provocation, and was able to shoot or not to shoot, and to govern his actions in that regard. He, as all the other physicians did who testified on this question, divided paranoia into three stages: The hypochondriac stage, the stage of persecution and the stage of transformation of personality. He stated that there was no evidence that the defendant ever passed through the hypochondriac stage or the stage of gloom, and that there is no evidence given by any of the lay witnesses that indicated that the defendant had passed into the stage of transformation of personality,—the stage in which the patient believes that he is some other person. He stated that there is some evidence tending to show that defendant had delusions of persecution. He further stated that all the authorities agree that the delusions in paranoiacs must be fixed and exist at all times without change. He called attention to the fact that the supposed delusions of the defendant at times had reference to the business men of Carmi, at other times to the politicians or officers of the county, and at other times to all the people or to the people across the river. It was his judgment that these delusions are lacking in the systemization that goes with paranoia. He also stated that from the testimony of the lay witnesses there was no indication that his unsoundness of mind or his delusions had continued but that if he had such delusions or unsoundness of mind he had recovered; that if he had paranoia, lay witnesses in associating with him would be able to readily discover it; also that in the stage of persecution a paranoiac has delusions directed against himself, only, and that if the defendant had paranoia he would not have included his brother in his supposed delusions of persecution. Witness had given considerable study to criminology, and in his judgment the defendant is not endowed, mentally, as the average individual and has distinct criminal tendencies but is not insane.

Defendant's sole defense on the second trial was insanity. It is the theory of his counsel that the defendant killed Nottingham as the result of a delusion that the deceased was trying to do or would do him bodily harm or under an irresistible impulse impelling him to do the act. Under the evidence as it appeared in the first record of this case there was much force, apparently, in that contention. Both the Benton witnesses and the expert witnesses for the defense based their opinion that he was insane and had delusions upon the belief that his statements to various of the lay witnesses that he had shot a negro, had served a term in the penitentiary therefor and that the people of Carmi "had it in for him," as he expressed it, were untrue and had no foundation in reason but were evidences of delusions originating from a diseased mind. Those supposed delusions are now removed from the consideration of the case, as it is now an established fact that he did shoot a negro, Lee Bush, served a term in the penitentiary, was afterward paroled and violated the terms and conditions of his parole. Many of the Benton witnesses, and also the expert witnesses for the defense, admitted that their belief in his insanity would be much weakened if it were proved that he did, in fact, shoot the negro and serve a term in the penitentiary for the offense, and particularly if it further appeared, as it actually does appear in this record, that none of his intimate acquaintances and neighbors and observers had ever noticed anything in his conversations or actions, up to the time of his trial, that caused them to think that he was insane or had delusions of any kind. Again, there was no evidence whatever in the first record of a motive for the killing, the evidence being that the defendant and Nottingham were good friends right up to the time of the killing. This was another reason for the conclusion of those witnesses that the defendant was insane and irresponsible. Who is prepared to believe that anyone but a maniac would kill apparently one of his best friends without any

excuse whatever, where there was strong evidence tending
to show he was insane?

With actual proof in the record that the defendant
killed a man by the name of Shores in White county, that
he shot Lee Bush, served a term in the penitentiary for
that shooting, was afterwards paroled and violated the con-
ditions of his parole, it requires no further argument to
convince any reasonable mind that such facts were suffi-
cient cause for the people of Carmi to resent such conduct
and to put him in disfavor with them.  When a defendant
relates the commission of an atrocious crime, or evidence
is introduced in his behalf showing the relation of such a
crime committed by him, for the purpose of proving insan-
ity and that his statements were made as the result of in-
sane delusions, it is competent for the State to prove the
truth of such statements, if the defendant has introduced
other proof tending to show that he was afflicted with in-
sanity and possessed of insane delusions.  Depravity of
character and abandoned habits are not in themselves evi-
dence of insanity.  Neither is the commission of an un-
natural and atrocious crime.  (*People* v. *Spencer*, 264 Ill.
124.)  His statements of the commission of the crimes
were not the only evidence offered of insanity, but other
evidence was offered tending strongly to show that he was
insane and afflicted with delusions.  The jury were there-
fore entitled to know the real truth as to his statements if
they were true, but not the details of the crimes, to enable
them to make the proper finding on the question of sanity.
All of the supposed delusions of the defendant were of the
same character,—delusions of persecution; and his belief
that the people of Carmi and Benton had it in for him was
evidently, so far as real, induced by his own criminal con-
duct, which he might well believe would condemn him and
put him "in bad" with all of the people.  While there is
testimony of his relatives that would indicate strongly, if
true, that he had paranoia, still it is not controverted that

if such insanity were real, close observers of him for a year after the killing would necessarily have discovered evidence of the affliction. There is no satisfactory proof by lay or expert witnesses that any symptoms of the disease were discovered during that time. The evidence that he was a paranoiac was largely opinion evidence, based mostly upon the supposition of facts overwhelmingly disproved by other witnesses. The finding of the jury that the killing of Nottingham was not done by reason of some irresistible impulse of the defendant or because of his reason or judgment being dethroned by paranoia or other form of insanity is well supported by the evidence in this record.

There was some evidence tending to show motive. The defendant gave to the trial judge as a reason for the killing of Nottingham that the latter had been fooling around the defendant's home and eavesdropping, and that he was afraid of him. The jury were warranted in the conclusion that Nottingham's fooling around defendant's home and eavesdropping, and not fear of him, were the real cause of all the malice displayed by defendant toward the deceased on the morning of the killing. A witness very close to Nottingham at the time he was shot did not hear him utter a word before the first shot was fired. According to his own statements the defendant had gotten drunk and abused his wife and mother. Why he abused his wife does not appear. We cannot longer refuse to assume that his statements were true and not prompted by delusions because not supported by other evidence, where later evidence shows that he, in fact, was not a victim of insane delusions. Besides, there is positive proof in the record by the defense that two days before the shooting his wife was complaining to the sheriff of White county that he had run off from her and wanted the sheriff to arrest him for that reason. The jury were also warranted in the conclusion that the defendant and his wife had had recent trouble and that he had left her because of it; that she knew where he had

gone and was suffering considerable anxiety as to what might happen if he were not arrested. The actual truth about this matter may never be known, but there is ample evidence in the record to establish express malice of the defendant in the shooting of Nottingham. All of his actions in the shooting, and his statements to the officers and others immediately after the shooting, clearly establish express malice and a wanton and most wicked and unmitigated killing.

There is no substantial error in the record. The challenges to the array of jurors of the regular panel, and also of the special panels summoned by virtue of special venires, were properly overruled by the court. These challenges were all based upon the fact that the sheriff of the county who summoned the regular panel was a witness in the case for the People. It was the duty of the sheriff to summon the regular panel of jurors under the statute. He did not select this jury from the body of the county. It was drawn in the regular way, and there is not one particle of evidence in the record of any misconduct of the sheriff by talking to the members of the regular panel or otherwise. Substantial rights must have been impaired to constitute error by the court in overruling a challenge to the array. (*Wistrand* v. *People*, 213 Ill. 72.) Defendant in error was not, therefore, entitled to have another regular panel summoned, and the court properly ruled that there was no valid objection to the special panels, which were duly summoned by special bailiffs in accordance with statutory provisions.

The court gave one instruction for the People defining the words "reasonable doubt," and that is assigned as error. It correctly stated the law and there is no objection to it on the ground that it did not do so. This court has frequently condemned the practice of giving many such instructions. (*People* v. *Moses,* 288 Ill. 281.) This court would not reverse a case even for the giving of a number of instructions of that character, unless it appeared from

the record that the defendant might have been prejudiced thereby. It is very clear that no prejudice whatever has resulted to this defendant by the giving of one such instruction accurately stating the law.

This question was asked of Dr. Anderson by the State's attorney: "Taking the testimony offered and your observations and examinations of the defendant, in your opinion was the defendant sane or insane?" Defendant's objection to this question was that witness could not base his opinion upon the whole evidence but that he should base it upon the evidence of one side or the other. The objection as stated was not a valid objection. In making his conclusion Dr. Anderson could properly consider all of the evidence in the case given by the lay witnesses of statements or actions of the defendant tending to show sanity or insanity. His entire testimony shows that that is exactly what he did do, and that he also considered the result of his examination as a basis for his conclusions. Of course, it would not have been proper for him to settle the whole case for the jury by telling them, in substance, that he had also considered the opinions given by the defendant's experts and their reasons therefor, and that their conclusions were not well founded and were insufficient to authorize a conclusion that the defendant was insane. The objection of the defendant did not call for a ruling on that proposition, and there is no substantial ground for complaint if the proper objection had been made and overruled. Such expert opinions are admissible in evidence and may be given on the personal observations of the experts or on the evidence of other witnesses detailing facts and circumstances and conversations which tend to show sanity or insanity. 1 Greenleaf on Evidence, sec. 440; *Schneider* v. *Manning,* 121 Ill. 376.

The witness George Chapman was permitted by defendant's counsel, without objection, to testify that the deceased lived on a farm with his wife and children. The

State's attorney then asked him the simple question, "How many children?" The court sustained an objection to the question, but while the objection was being made the witness answered, "Four." The court sustained a motion to strike the answer from the record. It is claimed by the defendant that he was prejudiced by the answer of the witness that the deceased had four children, notwithstanding the court held that it was improper evidence and struck it from the record, and notwithstanding the further fact that the defendant had already permitted the witness to testify, without objection, in substance, that the deceased had a wife and children. We cannot believe that the defendant was prejudiced by the mere giving of the number of children that the deceased had while living on the farm. The jury already had the information that he left a wife and children, and there was no motion to strike this evidence from the record.

The defendant has had a fair and impartial trial, in which all of his rights were guarded. We are unable to say, after a consideration of the whole testimony in this record, that there is clearly a reasonable and well-founded doubt as to the guilt of the accused. The crime committed by him is an atrocious one and warranted the death penalty. It is not the province of the court to interfere by setting aside the verdict of the jury and judgment of the court where no substantial error has been committed and real justice has not been denied.

The judgment of the circuit court is affirmed. The clerk of this court is directed to enter an order fixing the period between nine o'clock in the forenoon and four o'clock in the afternoon of April 15, 1921, as the time when the original sentence of death entered in the circuit court of White county shall be executed. A certified copy of such order shall be furnished by the clerk of this court to the sheriff of the county of White.

*Judgment affirmed.*