(No. 13878.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ELI D. LIMEBERRY, Plaintiff in Error.

*Opinion filed June 22, 1921.*

1. CRIMINAL LAW—*when indictment for homicide is sufficient.* An indictment for homicide is sufficient if it states the offense in the terms and language of the statute or so plainly that the nature of the offense may be easily understood by the jury.

2. SAME—*what allegations are not inconsistent.* In an indictment for murder, allegations that the deceased from October 5, 1917, until afterwards, October 5, 1917, languished and languishing did live, and that on October 5, 1917, he died of the mortal wound, are not inconsistent.

3. SAME—*one good count will sustain a general verdict.* One good count in an indictment will sustain a general verdict.

4. SAME—*when statement in defendant's conversation with a third party three days before homicide is admissible.* On the trial of a discharged employee for the murder of his former employer during an altercation over such discharge, a fellow-employee of the defendant who talked with him three days before the homicide may testify that the defendant asked why he was discharged and that the witness answered that it was because he drank.

5. SAME—*when statement as to what witness thought deceased had in his hand when he was shot is not improper.* In a trial for murder, where the defendant is shown to have shot and killed his former employer while the employer was on his way home, a statement of a witness of the shooting, in answer to a question whether he saw the deceased have anything in his hand, that he "thought it was a bunch of flowers or something," is not improper.

6. SAME—*when witness may testify as to distance of city limits from scene of shooting.* Where it is proved in a trial for murder that the defendant shot his victim while on a certain street of the city and that he immediately started north at a rapid walk or "dog-trot" for about a half block, when he gave himself up to his pursuers, it is not error, as bearing upon the question of attempted flight, to permit a witness to testify how far north the city limits were from the scene of the shooting.

7. SAME—*witness may give opinion of age of defendant.* In a trial for murder it is not error to permit a witness who has an opportunity for observation to give his opinion as to the defendant's age.

8. SAME—*when sheriff may identify revolver and cartridges introduced in evidence in murder trial.* The sheriff may identify the revolver, cartridges and bullets introduced in evidence in a murder trial, where it is proved that a witness picked up said exhibits immediately after the shooting and gave them to a policeman, who gave them to the sheriff, and where there is nothing to show that the articles, when introduced in evidence, were not in the same condition as when handed to the sheriff.

9. SAME—*when court may call child as a witness.* The court may call as a witness the eleven-year-old son of the defendant in a murder trial and may examine him as to circumstances occurring when he was with his father at a meeting with the deceased on the day before the homicide and at the time the crime was committed, and the witness may be cross-examined by counsel for the defendant and for the State as to such circumstances.

10. SAME—*what is not a good objection to preliminary examination of a non-expert witness.* The competency of a non-expert witness on the question of insanity is a question to be passed upon by the court before the witness can give an opinion before the jury, and it is not a good objection to the preliminary examination of such a witness for the defendant in a murder trial that counsel for the State will be given an unfair advantage in learning beforehand what the witness will testify before the jury.

11. SAME—*when court may caution counsel to examine witnesses before calling them to the stand.* Attorneys should not, as a rule, put witnesses on the stand without having talked with them and found out what they can testify to, and where a witness volunteers an improper answer to an important question it is not error for the court to tell counsel not to examine witnesses on important questions without first learning the probable nature of their testimony.

12. SAME—*when court may voluntarily take part in conduct of trial.* A considerable latitude must be allowed the trial court, in the progress of a criminal case, in asking questions of witnesses for the purpose of bringing out the truth in an impartial manner or in calling upon counsel for statements of what has preceded and in acquiring such knowledge as will enable the court to give proper rulings.

13. SAME—*when an instruction that jury may consider drunkenness as affecting the mind of defendant is properly refused.* In a trial for murder, where the defense is insanity, an instruction that drunkenness may be considered by the jury as a fact affecting the control of the mind of the defendant, and that it is competent to prove that the defendant was wholly incapable of form-

ing the intent to commit the offense, whether from intoxication or otherwise, is properly refused, where the evidence shows that the defendant was not so intoxicated as to be wholly incapable of forming an intent.

14. SAME—*when instructions as to form of verdict cannot be objected to.* In a trial for murder, where the defense is insanity, instructions as to the form of the verdict cannot be objected to by the defendant in the Supreme Court where there is no showing that counsel for the defendant presented any form of the verdict for the court to give which was refused.

15. SAME—*when it is not error to refuse to allow accused to take the witness stand.* In a trial for murder, where the defense is insanity, it is not error to refuse the request of defendant's counsel that defendant be allowed to go upon the witness stand, where the defendant, both out of and in the presence of the jury, has refused to be sworn or to answer questions by the judge touching such refusal, the evident purpose of counsel's request being to make an exhibition to the jury of the defendant's mental and physical condition.

WRIT OF ERROR to the Circuit Court of Livingston county; the Hon. G. W. PATTON, Judge, presiding.

ARTHUR A. LOWRY, and R. M. NIVEN, (LAWRENCE ELMER STONE, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, J. H. McFADDEN, State's Attorney, and ALBERT D. RODENBERG, (WILLIAM WILSON, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

Plaintiff in error, Eli D. Limeberry, was tried and convicted in the circuit court of Livingston county on the charge of murder and sentenced to the penitentiary for life. The record has been brought to this court by writ of error.

Limeberry at the time the crime was committed was a barber and had worked in a shop owned and operated by Ernest Reutter, in Fairbury, Livingston county, from late in August, 1917, until October 5, 1917, when he shot and

killed Reutter. He had worked regularly from the time he was employed until the shooting, except a few days when absent at Monmouth, Illinois, as a witness called by the State in a homicide case. Reutter left Fairbury after Limeberry went to testify in Monmouth, and after Limeberry got back, Ellis, one of the barbers, who was in charge of the shop in the proprietor's absence, telegraphed Reutter suggesting that he discharge Limeberry, and a telegram in response discharging Limeberry was received and shown to Limeberry on October 2. The telegram ordered Limeberry to deliver his keys and other things belonging to the shop to Ellis, which he refused to do. He inquired of Ellis when Reutter would return to the city, and was told Thursday evening, October 4. He went to the train with his son, about eleven years of age, to meet Reutter. Ellis also met the train and talked with Reutter first. While Limeberry was waiting at the depot he met J. B. Armstrong, who was in charge of another barber shop in Fairbury, and while talking together he called Armstrong's attention to the fact that his son had a revolver in his pocket, and Armstrong told him he had better not have the revolver around as he might be arrested, and Limeberry replied that that was why he let the young boy carry it. After Ellis had met Reutter at the train and had a talk with him they started to walk away together, when Limeberry stopped Reutter and said he wanted to talk with him, Ellis going on. There is evidence tending to show that during this talk Limeberry asked Reutter to come to his house that evening, and that Reutter promised to come, but although Limeberry waited for some time for that purpose Reutter did not come to Limeberry's house. The next morning Limeberry sent a note to Reutter at the shop by the eleven-year-old son, Marvin, and Reutter wrote on the back of the note, "Good job at Forrest," and the boy returned the note, with that answer on it, to his father. The evidence shows that at this time Limeberry had made arrangements with Armstrong to en-

ter his employ, and that morning, after receiving the note, he went with his son to the Armstrong barber shop and left the son on the street to watch for Reutter when he went by on his way to dinner. The son did this, and between eleven and twelve o'clock ran into Armstrong's shop and told his father Reutter was starting home. The father and boy went into the street, and when Reutter came along Limeberry met him and asked why he was discharged, and called deceased a vile name. Thereupon the deceased, who was considerably larger than Limeberry, kicked at him, or, according to some of the testimony, kicked him. They then had a little further talk, and deceased said, "You know why I did it; I discharged you because you were drinking, and we did not want you around the shop." Limeberry used some violent language in response, and the porter in Reutter's barber shop, who had come near and saw that Limeberry had taken a revolver from his pocket, called Reutter's attention to the fact that his dinner was waiting and he ought to go, and deceased started off, when Limeberry took hold of his arm and said, "I want to talk to you," again stating that deceased had treated him badly in discharging him the way he did, and Reutter replied, "All right." Limeberry said, "What did you fire me for?" and Reutter replied, "I just told you why I fired you; I have to go to dinner; see you this afternoon," and started away. Limeberry again took the revolver out of his pocket and fired three times at Reutter, one of the shots taking effect in his abdomen and another in the neck, the latter being a mortal wound. Limeberry then started away at a fast walk or at a run, going something over half a block from the scene of the shooting. On seeing his pursuers coming near him he threw his revolver away, held up his hands and was taken into custody by two of the men attracted by the shooting and placed in the city lock-up. Reutter was taken at once to the hospital and died very shortly from the effect of the wounds.

On the trial and in this record the shooting is admitted practically as stated, but the defense is that plaintiff in error was insane and therefore not responsible, and also that the trial court committed various errors which it is insisted should reverse the case.

Plaintiff in error at the time of the shooting was about thirty-six years old. He was born in Indiana, on a farm. It was testified that when about twenty-one years old he was thrown from a horse and as a result was carried to the house in an unconscious condition, in which condition he remained for several hours and was confined to the bed by the accident for several days. He remained on the farm after this accident for some time and then learned the barber trade. He was married about 1905 and went to work as a barber, afterward moving to Illinois. His sister testified that he was called home by his father's death, in 1909, remaining at the home a few days; that on this occasion she observed him sitting under a tree and putting stones on the ground; that he refused to come to dinner one time when called, and was seen to stand and look across the fields and when approached and addressed by relatives would not reply; that he was observed to be crying without giving any reason. It was further testified that he was seen by one of his brothers turning chairs over and throwing the bedclothes on the floor. This brother testified that when he was home at that time he looked wildly out of his eyes and seemed to be nervous; that on another occasion, while visiting at the brother's house, he went to bed with his clothes on. There was also testimony that at another time, five or six years previous to the trial, while he was being shaved by a barber who had known him since boyhood in Indiana he tried to get out of the chair but being talked to by the barber quieted down; that later he was taken by the same barber on a trip to West Baden for treatment and wanted to get out of the train when it was moving but was brought to his seat by his barber friend and taken to West

Baden; that he stayed a day and then went back home; that on this trip, without any apparent reason, he grabbed a check from the hand of one of his companions and tore it up.  The doctor who examined him at West Baden (or French Lick Springs) said he thought some of his actions were strange.  He worked at or near Monmouth as a barber for two years or more before he went to Fairbury, in August, 1917, part of the time running his own shop.  A short time before he left Monmouth he saw a homicide committed in a restaurant or ice cream parlor, and it was in regard to this crime that he was sent for as a witness to come to Monmouth just a few days before the shooting here in question.  A nephew, who also saw the homicide, testified that he met him in Monmouth on this trip and that he seemed very nervous; that during their visit there they went together, apparently at plaintiff in error's request, into the country and into a field of growing corn, and plaintiff in error said he did not want to go back to the city; that he was going to try to hide in the field, and he bent down some of the cornstalks for a place of shelter and showed he thought he was being pursued.  The nephew testified that he thought he was crazy at that time.  A sister-in-law of plaintiff in error testified that in 1917, while he was running a barber shop in Monmouth, he visited her and sat down on the floor instead of sitting in a chair; that in a few minutes he jumped up and sat on a bed; that she talked with him but he would not reply and only stared at her; that when he tried to get up she pushed him back on the bed and held him there; that she sat by his bed the rest of the night, and when morning came he got up and walked into the kitchen, drank some coffee and went away.  The State's attorney who sent for plaintiff in error as a witness and to whom plaintiff in error had told the story of the shooting in Monmouth right after it occurred, saw him on this trip back to Monmouth and told him that he did not think he needed him as a witness, as the testimony was largely on

whether the accused then being tried in Monmouth was crazy or of sound mind. After he returned to Fairbury from Monmouth, while talking to one of the barbers in Reutter's shop, the conversation turned to the homicide trial in Monmouth, and plaintiff in error said to the barber he did not know whether or not the defendant would be convicted as he was playing insanity strong and he thought he was going to get away with it. Both the State's attorney and the sheriff in Monmouth, who had known plaintiff in error for some time and who had considerable opportunity to talk with him while he was back there as a witness, testified they thought he was sane at the time and had been sane during the time they had known him in and about Monmouth for the two years or more before he went to Fairbury.

Part of the time while plaintiff in error was employed by Reutter in the barber shop there were three other barbers besides himself working there. At first he went to work at the third chair, Ellis being in charge of the first chair. The plaintiff in error was found to be a good barber, quick at work and attentive to the customers, and he was finally moved up until he had the first chair. Ellis testified that he did not want to remain in charge of the first chair, as it took so much of his time in settling and paying checks and making entries as to the amount of money taken in, so he requested Reutter to make a change, and the proprietor placed plaintiff in error in charge of the first chair. There is an intimation in plaintiff in error's brief that being placed in charge of the first chair made Ellis jealous, and the further intimation seems to be that Ellis' testimony may have been colored by his dislike of plaintiff in error. We find little, if anything, in the record to justify such conclusion. There is no evidence that would show any real cause for trouble between Ellis and plaintiff in error because of the latter's discharge by Reutter, although his counsel insist that Ellis was responsible for the discharge and had instigated

the employer to make it. It appears from the record that Ellis told plaintiff in error during the time he was working at the shop in Fairbury that neither he (plaintiff in error) nor anyone else could remain working there unless he kept sober and attended to business; that Reutter would not have a man who was drunk about his shop, and that he also told him a short time before he was discharged that he would not be surprised if he was discharged, because he had not been acting as he should. The evidence tends to show that plaintiff in error had been drinking witchhazel, lemon extract or bay rum the last few days he was employed by Reutter and that he had been under the influence of intoxicants at the time of his visit to Monmouth, and the State's attorney and the sheriff at Monmouth so stated.

The evidence shows that when plaintiff in error came to Fairbury after having been employed by Reutter he made arrangements for renting a house and shipping his goods; that there was some trouble about his goods being injured on the way; that he filed a complaint with the railroad company, and that he went about the business of renting a house and collecting these alleged damages in a methodical and businesslike way. The evidence of those who were familiar with that work in the barber shop does not tend to indicate in any way that he was not in a normal condition, mentally or physically. After he was arrested and taken to jail there is evidence tending to show that when he thought he was not watched by outsiders he acted as if he was in a normal mental condition, but that he would act strangely when somebody came in to see him or when he thought he was being watched. He would sit staring for a long time at the floor or at some place in the room and would appear frightened if people came in to see him. He would keep tapping the floor, and would not set his feet firmly upon the floor, like an ordinary person would in walking, but would walk on his toes. There is practically no testimony except from relatives,—sisters and brothers by blood or mar-

riage,—with reference to his mental condition being anything but normal, their testimony showing, it is claimed, that he was not in his right mind, describing isolated cases, usually several years apart. Some of the medical experts for the State testified that the condition described by these relatives as to those periodic attacks were all consistent with alcoholic indulgences and not consistent with any known mental disease; that in no kind of insanity does a man act by spells and periodically, as testified, while at other times he is for long periods absolutely normal.

It appears from the record that while plaintiff in error was being tried he would stare for long intervals at fixed places in the court room, roll his head and act strangely in other ways; that he refused to talk with his counsel in regard to the trial; that when certain doctors came to see him he told them he did not know his name or why he was in jail. Near the close of the trial his counsel, during the absence of the jury from the court room, asked to have plaintiff in error called as a witness, and at first an objection was made by counsel for the People, but they said they were willing to have the trial judge examine plaintiff in error and decide whether or not he should be allowed to testify. Counsel for plaintiff in error objected to this preliminary examination as to his qualifications to testify taking place in the absence of the jury, and the court finally ruled that if they wanted plaintiff in error to testify they must have him sworn by the clerk, and told them to take their client before the clerk and have him sworn. He was so taken but refused to hold up his hand, and refused to answer the court when asked if he wanted to be sworn. The jury was then brought in and counsel for plaintiff in error again demanded that he be sworn. Plaintiff in error himself took no part in the discussion and refused to be sworn, and the court finally refused to allow him to take the witness stand, although requested by plaintiff in error's counsel to allow him to walk from his chair in the court

room to the witness chair, so as to allow the jury to see his physical condition. It is clear from the statement made by the trial judge, as shown by the record, that he refused this request because of his opinion that the plaintiff in error's actions had been fully noted by the jury during all the days of the trial, and that his counsel were seeking an opportunity to have plaintiff in error take the witness stand for the purpose of making a further exhibition of his mental and physical condition.

It is manifest from this record that if no errors of law were committed during the trial which seriously affect the result the jury were amply justified from the record in finding plaintiff in error sane and responsible for the crime with which he was charged. It is necessary, therefore, for us to take up and consider the numerous errors that are charged by counsel for plaintiff in error to have been committed during the trial.

The first point urged as error that should be disposed of is that the court refused to quash the indictment, on motion, on the ground that it does not charge with definiteness the crime for which plaintiff in error was tried. Counsel's objections to the indictment are very general. They make the statement more than once that the indictment is insufficient,—that the allegations are inconsistent and irreconcilable with each other,—but do not set forth with accuracy wherein it is faulty in these particulars. As we understand their argument, they insist that the first and third counts of the indictment, in charging that the deceased from October 5, 1917, until afterwards, October 5, 1917, "did languish and languishing did live," and the further averment that on the 5th day of October, 1917, "the said Ernest Reutter of said mortal wound died," are inconsistent and contradictory one with the other, and that if the deceased lived all the 5th day of October he could not have died on the same day. Counsel appear to argue that the indictment charged that deceased lived all of the 5th day of October.

By using the word "all" we think counsel are placing a construction on the indictment that is not justified. The indictment does not allege that he lived all the 5th day of October. There can be no question that a man can languish and languishing can live and still die on the same day. This court long ago said that under our statute indictments should contain proper and sufficient averments to show a violation of law. "Great niceties and strictness in pleading should only be countenanced and supported when it is apparent that the defendant may be surprised on the trial or unable to meet the charge or make preparation for his defense for want of greater certainty or particularity in the charge. Beyond this it tends more to the evasion than the investigation of the charge, and becomes rather a means of escaping punishment for crime than of defense against the accusation." (*Cannady* v. *People,* 17 Ill. 158.) Our statute provides that an indictment for homicide "shall be deemed sufficient which states the offense in the terms and language of the statute, 'or so plainly that the nature of the offense may be easily understood by the jury.'" *People* v. *St. Clair,* 244 Ill. 444.

Counsel for plaintiff in error further object that most of the counts in the indictment omitted the name of Ernest Reutter in the conclusion, where it states "in manner and form aforesaid." All of the counts objected to are connected in legal language with certain averments which make them one connected whole in such a way that no other conclusion can be reached than that these allegations refer to Ernest Reutter, and there can be no question, under the reasoning of this court in *People* v. *Snyder,* 279 Ill. 435, that the indictment was not faulty in this regard.

It is also objected that some of the counts charged that the homicide was committed "by a certain pistol, commonly called a revolver, then and there charged with gunpowder." The argument is made that the allegation as to "charged" with gunpowder is not a clear and definite statement as to

how the death was caused. The word "charged," as given in several standard dictionaries, when applied to firearms, is defined as meaning "loaded," and the words "charge" and "load" are frequently given as synonyms. Whatever may be the ruling as to the sufficiency of indictments in other jurisdictions, there can be no question, under the decisions of this court, that this indictment was so worded that it did not mislead plaintiff in error or his counsel in any respect, and that it distinctly and clearly set forth the crime for which plaintiff in error was being tried and was not faulty in the respects criticised. (*Curtis* v. *People*, Breese, 256; *Palmer* v. *People*, 138 Ill. 356; *Lyons* v. *People*, 68 id. 271; Bishop's Directions and Forms, sec. 520; 3 Chitty on Crim. Law,—4th Am. ed.—*753.) Moreover, the indictment contained five counts, and the criticisms that are directed against it in general do not apply to all of the counts, as urged by counsel. It has long been the settled law of this court that one good count will sustain a general verdict. *Duffin* v. *People*, 107 Ill. 113; *McElroy* v. *People*, 202 id. 473; *Koser* v. *People*, 224 id. 201.

Numerous objections have been made as to the rulings of the trial judge on the admission and refusal to admit certain testimony. We will refer to a few of what we consider the most important, although we consider many of the objections hypercritical and without real merit.

It is argued that it was improper for the court to admit testimony as to a conversation three days previous to the day of the homicide, between plaintiff in error and Ellis, the man in charge of the barber shop where plaintiff in error was employed, as to why plaintiff in error was discharged, in which Ellis was permitted to answer that it was because he drank. This conversation was between witness and plaintiff in error himself. The grounds of the objection were not stated at the time it was made. It was shown without controversy by the evidence that plaintiff in error was insistent before the homicide to know the reason of

his discharge and having learned it was still thinking about it, and apparently wished to argue the matter with the deceased before and at the time of the shooting, and whatever might have been plaintiff in error's motive in shooting Reutter, if it should be rightly considered a part of the *res gestæ,* it is proper to be admitted in evidence. (*Henry* v. *People,* 198 Ill. 162.) "The true inquiry is whether the declaration is a verbal act illustrating, explaining or interpreting other parts of the transaction of which itself is a part, or is merely a history or a part of the history of a completed past affair." (*McMahon* v. *Chicago City Railway Co.* 239 Ill. 334.) The question of the discharge covered several days, and the reason Ellis gave to plaintiff in error for the discharge was illustrated, explained and interpreted by the actions of plaintiff in error from October 2 up to the time of the shooting.

Some point is also made that the telegram discharging plaintiff in error was shown to the witness who was testifying regarding it, before it was shown to opposing counsel. The telegram had been before the shooting and up to the time of his arrest in plaintiff in error's possession, and it is difficult to see how he was in any way prejudiced by not having it presented to his counsel before it was offered in evidence. It is clear from the record that opportunity was given to cross-examine on the telegram, as was requested by counsel.

It is also objected that witness Troehler, who had already testified for the State, on being asked to tell what he saw at the time of the shooting, and having testified to seeing plaintiff in error take the revolver from his pocket and put it back and then take it from his pocket again and fire the three shots, was permitted to answer the question, on examination by counsel for the People, how many times he saw plaintiff in error draw the gun out of his pocket. We do not think this question and answer were improper, as his testimony had not theretofore made it clear as to

how many times he had seen the revolver taken from plaintiff in error's pocket.

It is also argued that it was error for witness Merton Leaf, in answer to the question, "Did you see Mr. Reutter have anything in his hand there that day?" to reply, "Yes, sir; well, at that time I thought it was a bunch of flowers or something." After discussion on the question, the court said that if that answer was the opinion of the witness as to what the deceased held in his hand it was proper, and it appeared that it was the witness' opinion. Another witness testified in regard to this matter that Reutter had told him he was taking home a handful of grass for the chickens. The objection of counsel to Leaf's answer as to what Reutter had in his hand was, that the State wished to impress upon the jury the idea that this was an act of thoughtfulness toward his family on the part of the deceased; that he was taking home a gift of flowers. Leaf answered, after the discussion before the court, that he thought that the deceased was holding in his hand "one of these here ferns." There is no showing in the record that counsel for the State attempted to impress the jury improperly with reference to what Reutter was carrying in his hand. The jury had all the testimony before them, and we do not think anything was testified to or admitted in regard to this matter that was in any way prejudicial to plaintiff in error's interests.

Objection is also made that the witness Mose Greenbaum, after having stated that he had not seen plaintiff in error on that day previous to the time of the shooting, was asked by counsel for the State if he was not mistaken about not seeing plaintiff in error over in the garage previous to the shooting, and was permitted to answer, over objection, "Yes, I seen him over there; he was there about fifteen minutes." Other witnesses testified that plaintiff in error had been in the garage before the shooting and there is no testimony in the record that he was not there. There was no error in the examination of Greenbaum on this point.

298—24

It is also earnestly insisted that there was error in permitting a witness to state how far north the city limits are from the scene of the shooting. The record shows that plaintiff in error started north at a rapid walk, or "dog-trot," right after the shooting, and that when he was pursued by persons attracted by the shots he dropped his revolver and threw up his hands. Just how strongly his actions tended to show an attempt to get away it is not necessary for us to pass upon, for if there was any basis for that conclusion such testimony was admissible. "In criminal cases a portion of the evidence laid before the jury often consists of the conduct of the party, either before or after being charged with the offense, presented not as a part of the *res gestæ* * * * but as indicative of a guilty mind. * * * It has therefore been held perfectly competent for the prosecution to prove an attempted escape of the accused." *Jamison* v. *People,* 145 Ill. 357; see, also, *People* v. *Bundy,* 295 id. 322.

Neither was there any error, as urged by counsel, in permitting the same witness to give his opinion as to plaintiff in error's age. This court has said: "The rule of evidence is that a witness, after describing the appearance of a person as best he can, may give an opinion of his age. * * * From appearances a qualified witness may estimate the age of a given individual by stating what effect the observed appearances have produced on his mind." *People* v. *Kielczewski,* 269 Ill. 293.

Neither is there force in counsel's argument that there was error in permitting the sheriff of the county to identify the revolver, cartridges and bullets which were introduced in evidence, it being argued that it was not shown that they were in the same condition as when received by him after the shooting. The evidence shows that these exhibits were delivered by witness Hornback, who picked them up immediately after the shooting, to policeman Baker and by Baker given to the sheriff. There is nothing in the record

to indicate that these articles were not in the same condition as when handed to the sheriff, and it was stated they appeared to be in the same condition.

It is also objected that the court erred in calling as its witness Marvin Limeberry, the son of plaintiff in error, who was then about eleven years of age. The trial judge examined this witness in chief as to whether or not he remembered the circumstances of his father meeting the deceased at the train on the night previous to the shooting, and counsel asked him, on cross-examination, about his watching for Reutter, about his having a revolver at the station and about the shooting. Counsel for the State cross-examined, and, calling the witness' attention to particular statements, asked him if he had heard his father make those remarks, as to nearly all of which the boy answered he did not remember. On the hearing the boy testified that Reutter was coming towards his father at the time his father began shooting, and said that he did not so testify before the grand jury because that question was not asked him. We cannot see that the boy's testimony in any way materially differed from that of the other witnesses as to what took place at the various times in regard to which the boy testified. Under the rulings of this court there was no error in the examination of this witness. *Carle* v. *People,* 200 Ill. 494; *People* v. *Cleminson,* 250 id. 135; *People* v. *Lurie,* 276 id. 630.

It is further argued that there was error in the rulings by the court as to certain of the testimony offered or attempted to be offered by counsel for plaintiff in error and in certain comments made by the court upon the evidence offered. It is objected as to the witness Sadie Lomax, a sister of plaintiff in error, who was examined at some length out of the jury's presence to determine her competency to give an opinion as to the sanity of plaintiff in error's father, that the People were given an unfair advantage in learning beforehand what her testimony would be before the jury.

This was a question for the court. The competency of the witness was a question to be passed upon by the court before her opinion was submitted to the jury. This court said in *Martin* v. *Beatty,* 254 Ill. 615: "Whether a non-expert witness has sufficient knowledge of another to express an opinion on his mental condition is to be determined by the court." We do not see what possible harm could come to the interest of plaintiff in error by this preliminary examination.

Without discussing in detail all of the objections as to the examination of certain witnesses and the rulings of the court thereon, we may say in general that most of these questions refer to rulings as to questions asked of relatives of plaintiff in error as to what they had seen in his acts that would justify them in giving an opinion as to his sanity, and while certain of the State's objections with reference to answering these questions were sustained by the trial court, it appears that all these witnesses, without exception, were in the end allowed to give their opinions as to the sanity of plaintiff in error, and therefore no prejudicial error occurred with reference to sustaining the objections urged.

One of the sisters was asked by counsel for plaintiff in error what she saw plaintiff in error do at a certain time, and she answered, "When I seen him I seen that he was not acting right." A motion was made to exclude this answer and was allowed, but the court concluded the statement allowing the motion with the following: "You people cannot get anything before this jury to stay as evidence, of any description of an opinion as to his conduct, until you state first what the facts were or what was said." It may be conceded that this statement of the court was improper, but there was no exception to the remark and therefore the objection cannot be properly raised as to it.

Again, it is suggested that during the examination of one of plaintiff in error's relatives the witness was asked,

"Were you at Sandoval at any time while the defendant was there?" and when he replied that he was, he was asked, "State the circumstances under which you went," and answered, "I got a telegram from his wife's brother to come at once,—that he was crazy." Objection was made to this answer, and the part of the answer that was apparently volunteered by the witness was stricken out by the court, and the court asked counsel for plaintiff in error the question, which was objected to and which is now insisted was error, "Didn't you know that was it?" (manifestly referring to the question, "State the circumstances under which you went," and the answer thereto,) and counsel answered, "No, sir; I didn't," and the court then said, "I will exclude it, and the jury disregard it." Counsel for plaintiff in error then said that he did not have a chance to talk with the witness, as he had been out of town, and the court said, "He has been here two or three days." Counsel for plaintiff in error then stated that he left town yesterday, and the court said: "He has been here long enough; don't put anybody else on you have not talked to; the people have some rights here; do that during the noon hour." There can be no question that lawyers should not, as a rule, put witnesses on the stand without having talked with them and found out what they can testify to, and in view of counsel's question to the witness and the improper answer that was volunteered we do not think the court erred in telling counsel not to examine witnesses on important questions of the nature under discussion without first learning the probable nature of their testimony. In the proper conduct of the trial in a case such as this the judge is necessarily a factor in the administration and enforcement of the law and it is not improper for him to aid in bringing out the truth in a fair and impartial manner, and necessarily a considerable latitude must be allowed the trial court, in the progress of a criminal case, in asking questions of witnesses or calling upon counsel for statements of what has preceded and pos-

sessing himself of such knowledge as will enable him to give proper rulings. (*Featherstone* v. *People,* 194 Ill. 325; *People* v. *Curran,* 286 id. 302; *People* v. *Lurie, supra.*) While some of the things that the trial judge said during this long and hotly-contested trial should not have been said, we do not think, under the rulings in the cases just cited, that any reversible error was committed by him in that regard.

It is further argued that during the argument by one of plaintiff in error's attorneys before the jury the court erred in refusing to allow him to read at length from *Hopps* v. *People,* 31 Ill. 385, and *People* v. *Casey,* 231 id. 261. This court has said that "the general rule is that counsel may read extracts from the opinions in reported cases bearing upon the law in the case but not the facts in the opinions. * * * It may be necessary in some cases for counsel, under proper supervision of the court, to read enough of the ultimate facts in order that the jury may understand how the law is to be applied." (*People* v. *Rees,* 268 Ill. 585.) We cannot say from the record before us that counsel were improperly restricted in reading from the decisions in question.

Numerous objections are also urged as to the giving and modifying of instructions. It does not appear clearly from the record or abstract that all the instructions given are shown therein or all the modifications complained of.

It is objected that it was error to give People's instruction 23. This was on the subject of drunkenness as a defense to crime, and we think is substantially the same instruction as was approved by this court in *Bleich* v. *People,* 227 Ill. 80.

It is urged that the court erred in modifying a certain instruction offered by counsel for plaintiff in error which, as offered, read: "The court instructs the jury that the testimony of doctors upon the subject of mental capacity is not entitled to any greater weight than that of laymen, who

are men of good common sense and judgment." The instruction modified by the court and given was as follows: "The court instructs the jury that the testimony of doctors without training in mental and nervous diseases, upon the subject of mental capacity are not entitled to any greater weight than that of laymen, who are men of good common sense and judgment." This court has held "that the relative weight to be given to the opinions of medical and non-medical experts cannot be determined by any rule of law, * * * but the weight to be given to the opinions of witnesses testifying as experts is always a matter to be determined by the jury from all the circumstances appearing in evidence." (*People* v. *Harvey,* 286 Ill. 593, and cases there cited; see, also, as bearing on this question, *VanHorn* v. *Keenan,* 28 Ill. 445, and *Carpenter* v. *Calvert,* 83 id. 62.) There can be no question that the instruction as worded when offered was erroneous and that the court's modification made it less subject to objection than it was when offered, and therefore counsel for plaintiff in error are in no position to argue that it laid down an incorrect rule of law or that it was error to give it as modified.

It is also urged that the court erred in refusing to give what counsel for plaintiff in error in their brief call No. 62 of plaintiff in error's instructions. That instruction as offered read:

"The court instructs the jury, that drunkenness was at common law, as under our statute, no excuse for crime, but where the defense of insanity is interposed, as in this case, and where the nature and essence of the offense is by law, made to depend upon the state and condition of the mind of the accused at the time, and with reference to the act done or committed, drunkenness as a fact affecting the control of the mind, is proper for the consideration of the jury, and it is competent to show in this case, that the defendant Eli D. Limeberry, was at the time the act was done or committed, wholly incapable of forming the intent to commit

the offense, as alleged in the indictment, whether from in-
toxication or otherwise."

This instruction is plainly misleading and not in ac-
cordance with the law. It was properly refused, if for no
other reason than that it was not based on the evidence, for
the evidence tended strongly to show that plaintiff in error
was not so intoxicated, at the time he committed the crime,
as to be wholly incapable of forming an intent. The only
evidence of intoxication at the time of the homicide was
that his eleven-year-old son testified that he thought his
father drank something at the house before he left to go
down-town previous to the shooting. Under the authorities
relied on by counsel for plaintiff in error, such as *Crosby*
v. *People,* 137 Ill. 325, *Schwabacher* v. *People,* 165 id. 618,
*Bruen* v. *People,* 206 id. 417, and *People* v. *Jones,* 263 id.
564, the offered instruction, even conceding that it was cor-
rect if it had been confined only to the condition of plaintiff
in error's mind as caused by drunkenness, should not have
been given; and it was particularly objectionable on this
point because it mixed drunkenness and his mental condi-
tion caused otherwise, particularly as stated by the conclud-
ing words, "whether from intoxication or otherwise."

The forms of verdict are objected to. Six were given.
The statute provides in regard to this question that if
counsel for the defendant desire other forms of instruc-
tions given as to insanity they should present them to the
trial court, (*Dacey* v. *People,* 116 Ill. 555,) and there be-
ing no showing here that counsel presented any form of
the verdict for the court to give which was refused, this
question cannot be raised here.

Numerous objections are urged to other instructions and
to other rulings of the court which we deem it unnecessary
to consider in detail. It is sufficient to say that we have
examined them all and find that most of them are without
any merit and that in none of them was reversible error
committed by the court. The evidence, as already stated,

clearly shows that plaintiff in error was guilty as charged in the indictment; that numerous witnesses who were familiar with his actions for several years while he was acting as a barber in Monmouth, and during the several weeks that he worked as a barber in Fairbury, immediately before the homicide, all testified that he was sane, and nothing was shown to prove the contrary. The jury were amply justified, under the reasoning of this court in *People* v. *Lowhone,* 296 Ill. 391, in finding plaintiff in error responsible for the crime in question.

We find no error in the record. The judgment of the circuit court will be affirmed. *Judgment affirmed.*