<hr/>

[No. 218. Decided January 11, 1892.]

THOMAS F. KENNEDY, *Respondent*, v. JAMES W. CURRIE
AND MATILDA CURRIE, *Appellants*.

CANCELLATION OF DEED—UNDUE INFLUENCE—INADEQUATE CONSIDERA-
TION—EVIDENCE.

Where a man seventy-five years of age, weak in body and mind,
childish, eccentric, and deemed by his neighbors mentally unsound,
being without ready money and unable to support himself, does, in
consideration of an agreement to care for him during his life, deed

to another party, at the latter's request, a tract of land, which in view of his expectancy of life, is worth far more than the care of him will amount to, and there are circumstances showing he did not clearly comprehend the bargain he was entering into, a court of equity will decree a re-conveyance of the land on the grounds of undue influence and inadequate consideration.

Where there is no allegation nor testimony that defendants had solicited the attorney who drew the deed and contract to use his influence with plaintiff to get him to make the deed, defendants' offer to prove that they had not solicited said attorney is not material

*Appeal from Superior Court, Snohomish County.*

The facts in this case are stated in the opinion.

*Metcalfe & Turner,* and *Andrew F. Burleigh,* for appellants.

*W. R. Andrews,* and *F. M. Headlee,* for respondent.

The opinion of the court was delivered by

DUNBAR, J.—This is a suit brought by Thomas F. Kennedy to cancel a conveyance of land alleged to have been fraudulently obtained from him by the appellants on the 5th day of April, 1887. Plaintiff alleges—

"That on said 5th day of April, and while the plaintiff was the owner of said land as aforesaid, and the same was of the value aforesaid, and was free from all incumbrances of every nature and kind, and while the plaintiff was weak in body and mind as aforesaid, all of which was at the time well known to defendant James W. Currie, and he desiring and intending to overreach the plaintiff, and to cheat and defraud him of his said land, said defendant falsely and fraudulently represented to the plaintiff that he would, at his own proper expense, maintain, support, clothe and in all respects properly care for the plaintiff, in sickness and in health, from that time until the time of his death, and that he should in every respect be comfortably provided for, if at the plaintiff's death he (defendant) could have the title to the plaintiff's aforesaid land; and the plaintiff being weak in body and mind as aforesaid, and being desirous of

securing a comfortable home for himself and proper care and comfort during the remainder of his natural life, and having full confidence in defendant, consented to accede to the said defendant's request; that thereupon said James W. Currie, intending to overreach and cheat and defraud the plaintiff as aforesaid, falsely and fraudulently represented to the plaintiff that the only way to properly carry said agreement into execution was for the plaintiff to forthwith convey all of said land by good and sufficient warranty deed to the defendant, and to take back from said defendant a memorandum of agreement, and the plaintiff being weak as aforesaid, and easily persuaded, and having full confidence in said defendant, consented to make such conveyance; and on the said 5th day of April, 1887, made and delivered to said defendant his (plaintiff's) warranty deed to said premises, and every part and parcel thereof with the appurtenances, thereby conveying said premises, and every part and parcel thereof, with the appurtenances, unto the said defendant in fee simple."

It is alleged that the value of the land, at the time of the conveyance, was of the value of seven thousand dollars and over, and at the time of the commencement of this action (in June, 1889), it was of the full value of ten thousand dollars. Plaintiff alleges, and that fact is undisputed, that shortly after the conveyance was executed, he turned over the possession of the land to appellants, and that they from that time exercised dominion and control over it; and the evidence shows that defendants made valuable improvements on said land, and that they also took and sold quite a considerable amount of timber therefrom. The consideration of said conveyance was a written agreement executed by Currie and delivered to Kennedy, which was as follows:

"Whereas, Thomas F. Kennedy, of Snohomish county, Washington Territory, has this 5th day of April, 1887, conveyed by good and sufficient deed of bargain and sale, to James W. Currie (residence and description omitted), now, therefore, I, James W. Currie, as aforesaid, in consid-

eration of the premises, to wit, the conveyance to me of the above described property by said Kennedy, the deliverance of the deed for the possession of the same, and the possession of the premises being hereby acknowledged, do hereby undertake, covenant and agree to and with the said Thomas F. Kennedy, to support, maintain and care for him, the said Kennedy, in the manner following, that is to say: I hereby bind myself and my heirs, and obligate myself and them, in consideration of the premises aforesaid, to support, care for and maintain said Kennedy during his natural life, in a proper and respectable manner, furnishing to him, said Kennedy, all food, clothing and shelter necessary for his individual comfort and life; to properly care for and attend him in his sickness, furnishing him skillful medical assistance and all necessary medicines whenever the same may be necessary. The intent of this obligation is to properly care for said Kennedy, and furnish him a comfortable home and support as long as he, the said Thomas F. Kennedy, may live. In witness whereof, I have hereunto set my hand and seal this 5th day of April, 1887.

"(Signed)                    JAMES W. CURRIE."

It is alleged that, since the execution of the said deed by plaintiff the defendants have wrongfully and fraudulently conveyed away five acres of said land; that defendants have not kept their contract with plaintiff, but have uniformly neglected to supply him with wholesome provisions, or with a home, or with comfortable clothing, or with necessary medicine or medical assistance. Plaintiff alleges, and it appears from the testimony, that he has no money whatever, and no property outside of the lands in question, and he asks that the defendants be decreed to surrender up said deed, and he be allowed to recover said land and property, such as has not been already conveyed in good faith to innocent purchasers. The answer of the defendants admits the conveyance of the land and the execution of the agreement, but denies that at the time of the conveyance of said land plaintiff was of an unsound and non-contracting mind, or that they took any advantage of his

condition or necessities, or that they have failed to faithfully perform the conditions of their contract, in providing for and attending to the wants of plaintiff. And defendants aver that at the time of the making of the contract it was fully understood and agreed upon between the said plaintiff and defendants, that the said deed should be executed to, and the title to said land fully vested in, said Currie, at the time as aforesaid, when his said contract was made by said plaintiff. That the contract was fair, free and voluntary on the part of both parties thereto, and that said consideration was fair and adequate, and all that the said land was reasonably worth. It was alleged that, at the time of the execution of said deed, the said land was charged with an incumbrance of seven hundred and fifty dollars, which indebtedness was paid by defendants, thereby discharging the said incumbrance; and it was also alleged that the defendants had been at great expense in maintaining and caring for plaintiff since the execution of said contract, to wit, in the sum of $1,500. And plaintiff, in his reply, offers that whatever may be found by the court as a just and equitable compensation to defendants for their care and maintenance of said plaintiff, may be declared to be a lien upon said land, as well as whatever sum of money said defendants have advanced on account of the incumbrance mentioned in the answer, together with interest thereon at legal rate from the time of said judgment. Defendants admit the value of the land at the time of the contract to be five thousand dollars.

On these issues the parties went to trial, and the court found the issues in favor of the plaintiff. The questions presented for determination are—(1) whether the plaintiff, at the time of the execution of the deed of conveyance in question, was of such a condition of mind that he was capable of transacting important business and understanding fully the nature and effect of the transaction; and (2) if he

was so capable, then, whether he was acting under compulsion, or under the influence of the defendants, or whether an undue advantage had been taken of him for the purpose of overreaching or defrauding him; and to determine these propositions all the circumstances of the case must be taken into consideration, the age of the party complaining, his mental condition, his knowledge of the business in question, his habits of life, and every other circumstance which will aid the court in determining whether it is a case that will justify the interference of a court of equity; for while courts should not and will not interfere to set aside improvident contracts, and should closely scrutinize every such contract, especially in this country where the value of land is exceedingly fluctuating, and where there is great temptation for people who speculate in prices to seek to escape the legitimate consequences of their ill-advised ventures, yet, notwithstanding, courts of equity, with a proper degree of caution, always have, and always will, protect the interests of the weak and helpless, and will not hesitate when applied to to set aside a contract made with a person who from any cause has not a contracting mind. In the case at bar we have examined all the testimony, and have no hesitancy in saying that the agreement entered into between these parties was too one-sided to commend itself to a court of equity. Kennedy was an old man, seventy-five years of age, sick in both body and mind, and, in his neighborhood had, without any doubt, been considered as being actually insane for many years, had, indeed, been twice arrested and examined on the charge of insanity, and although on both occasions he had been acquitted the fact remains that he was charged with insanity, and that was sufficient to put people on their guard in dealing with him. He was probably discharged because it was found that he was not dangerous, as that is generally the interest the community has in such examinations. Certain it is from all the tes-

timony in the case that his sanity was questioned in the neighborhood where he lived, and that at least he was so eccentric that the line of demarcation between eccentricity and insanity was very dimly drawn; and it is a matter of common observation that age does not cure eccentricities or weaknesses of the mind, but that extreme old age develops such infirmities. Says Judge STORY, after speaking of the responsibility of drunkards:

"Closely allied to the foregoing are cases where a person, although not positively *non compos*, or insane, is yet of such great weakness of mind as to be unable to guard himself against imposition, or to resist importunity or undue influence. And it is quite immaterial from what cause such weakness arises, whether it arises from temporary illness, general mental imbecility, the natural incapacity of early infancy, the infirmity of extreme old age, or those accidental depressions which result from sudden fear or constitutional despondency or overwhelming calamities. For it has been well remarked that, although there is no direct proof that a man is *non compos* or delirious, yet if he is a man of weak understanding, and is harassed and uneasy at the time, or if the deed is executed by him *in extremis*, or when he is a paralytic, it cannot be supposed that he had a mind adequate to the business which he was about, and he might very easily be imposed upon." 1 Story's Equity Jurisprudence, § 234.

This case seems to fall clearly within the scope of this section, and while some of the witnesses testify that Kennedy was a man of large experience and observation, that he was well read and entertaining in conversation, yet this does not contradict the theory that he was incapacitated from transacting important business; for many persons who are thus plainly incapacitated are very bright and entertaining on some certain subjects. But the testimony of those who have known him the longest and best, and who have had the best opportunity to observe him, shows conclusively that he was not capable of transacting important business, and it

cannot be gainsaid that this was a contract of the highest and gravest importance to him. W. H. Freese testified that he had known "Kennedy for over two years; had lived close neighbor to him; observed his demeanor, talk and actions, and did not think he was hardly competent to make the contract he did; he could not say Kennedy was a demented man in all respects, but did not think he was exactly right in all respects; had seen him play with little children, and fall out with them like a little child." The testimony of this witness was short; but, if it was true, and it was not contradicted, it was most convincing that this man was in his second childhood, and as much in need of a guardian to protect his interests as he was in his first childhood. Samuel Fourtner testified:

"Kennedy boarded with me for five or six months. I have known him for a number of years. I have observed his conduct, demeanor and actions, and from my observations I would consider him a man of rather weak mind. I would judge him a man of weak mind and understanding. If the Kennedy land had been mine I would hate for him to have the disposal of it. I think that Kennedy is an old, weak and childish man. I would not consider him capable of attending to business."

It will be observed that this witness's opportunities for knowing the mental condition of Kennedy could not have been better, he having been an inmate of his house for several months, and the testimony of such a witness would be more valuable than the testimony of a great number of witnesses who were mere casual observers. Every circumstance of the case strengthens the supposition that Kennedy was not a safe man to transact business. Currie, according to his own testimony, knew of many of his eccentricities at the time he first made the contract with him; knew that he had had trouble with Dinsmore, a man with whom he had been under a similar contract with reference to the same land; must have known, according

to his own statement, that he was at least erratic, weak, fault finding and suspicious; he took notice of the unusual condition that he demanded to have incorporated in the contract, to wit: That when he died he should be rolled in his blanket and thrown into the sea, or that he should be rolled in his blanket and buried by the side of his black dog, and Currie told him that he would have nothing to do with the matter unless he could bury him decently. Kennedy made no reply, and it was not put into the contract. Currie also testified:

"At that time I told Mr. Metcalfe, and then all, that I wanted nothing to do with the property—that I would have nothing to do with it unless I was the free owner and could command it to suit myself. That I would not take it under other circumstances; that I must have the absolute title, and that was the understanding we came to in the presence of Kennedy, and he agreed to it."

It seems tolerably plain, from all the testimony, that about the same attention was paid to the old man's wishes in regard to the disposition of the land as there was in regard to his wishes concerning the disposal of his body after death.

The court has found, and we think from the testimony rightfully, that the consideration was inadequate. Kennedy's probable expectancy of life at the time of the execution of the contract must be taken into consideration in determining the adequacy or inadequacy of the consideration. He at that time was about seventy-five years old, had long since lived out the time ordinarily allotted to man, was broken down mentally, and subject to severe spells of sickness, and although between four and five years have elapsed since that time, and he is still living, yet it is a longer time than his extreme age and the state of his health at that time rendered probable. But the most inequitable feature of this case is, that Kennedy was without any security

for the enforcement of his contract.   As hard as this character of contracts generally are, they are almost universally made on the supposition that the title does not pass until the conditions are fulfilled.   In this instance, either Kennedy's contention is true, that he was misled and deceived as to the full import of the deed of conveyance, or the other theory must obtain, that he was not competent to attend to business.   Here is a man enfeebled with age, unable to work or support himself, without any relatives or friends to care for him, or to protect him from actual want, absolutely deeding away and placing beyond his control his homestead, a valuable tract of land, which was all his earthly possessions, and which, beyond question, was worth enough to support him in comfort and decency the balance of his days.   And what did he get in return? Not a lien on the land for the faithful performance of the trust, but a written statement of Currie, a stranger, that he would take care of him while he lived.   It was even not a joint agreement from Currie and his wife, although upon the execution of the deed the land became community property, and subject to community debts and community disposal.   Under this arrangement the defendants could sell off every foot of the land the next day after the deed was executed; in fact, it is admitted that several acres of the land have already been sold, and the old man, if this conveyance were held good, instead of having a valuable tract of land to rely on for his support, would be relegated by the law to Currie's generosity. Evidently no such an uncertain state of affairs was in his mind at the time he entered into this contract, and it is no wonder that the simple old man became agitated when he discovered that the word "assigns," the occurrence of which he thought necessary to protect his interests, was omitted from the contract, or that he was not deterred by the threat of a "bundle of switches" from the hands of Currie from asking the protection of a court of

equity. In this case the consideration was not only inadequate, but the accompanying incidents were inequitable, and the law is thus stated by Pomeroy's Equity Jurisprudence, vol. 2, § 928:

"When the accompanying incidents are inequitable, and show bad faith, such as concealments, misrepresentation, undue advantage, oppression on the part of the one who obtains the benefit, or ignorance, weakness of mind, sickness, old age, incapacity, pecuniary necessities and the like, on the part of the other, these circumstances, combined with inadequacy of price, may easily induce a court to grant relief, defensive or affirmative."

In this case, according to Currie's statement and the undisputed testimony throughout, Kennedy was pecuniarily embarrassed, and was driven by his necessities to make some arrangement for his support. If deeds are obtained by the exercise of undue influence over a man whose mind has ceased to be the safeguard of his actions, it is against conscience for him who has obtained them to derive any advantage from them. It is the peculiar province of a court of conscience to set them aside. That a court of equity will interfere in such a case is among its best settled principles. *Harding v. Handy,* 11 Wheat. 103. And outside of any proffer made by defendant Currie to re-deed the land if he were made whole, we think the judgment of the court should be sustained, and that defendants have been amply recompensed for their time, trouble and expense.

We are unable to see the materiality of the testimony offered to be proven by witness Metcalfe. There was no allegation that Currie had solicited Metcalfe to use his influence with Kennedy to get him to accept said contract, or to make said deed, or to enter into any arrangement that was entered into by the parties, and there was no testimony to that effect, and defendants could not make out their de-

fense by proving that the had not solicited Metcalfe or any other person to use their influence with the plaintiff.

The next offer was entirely too sweeping, and could not have been received by the court over the plaintiff's objection, as several different propositions were embraced in the one offer. Metcalfe had already testified concerning his professional services for Kennedy in drafting the contract, and testified that at the time the contract was made it was read exactly as it was written to Mr. Kennedy and Mr. Currie, in the presence of each other, and was fully explained to both parties, and that in his judgment Kennedy was then of sound and disposing mind, thoroughly capable of understanding his own interests and the effect of any act he might do, and mentally competent to contract and to conduct his own business transactions; and that the execution by Currie of his contract to support Kennedy, and Kennedy's deed of the land in controversy to Currie, were simultaneous acts. At all events, the testimony of the witness, whatever it may have been, if it had only been responsive to the offer, could not have affected in our judgment the final disposition of this case, for sufficient clearly appears, outside of any controversy between the plaintiff and the attorney Metcalfe, to sustain the judgment.

We have examined the other errors alleged, and think they are without merit. Having reviewed the case on its merits and found in favor of the respondent, it is not necessary to discuss the motion to dismiss the appeal.

The judgment is affirmed.

ANDERS, C. J., and SCOTT, HOYT and STILES, JJ., concur.