[No. 30194. Department Two. August 28, 1947.]

CHARLES PARRIS et al., Respondents, v. NENA BENEDICT et al., Appellants.[1]

Bean & Minnick and Cameron Sherwood, for appellants.

John C. Hurspool and Carl L. Johnson, for respondents.

STEINERT, J.—Plaintiffs brought suit seeking cancellation of two deeds which had previously been executed and

[1]Reported in 184 P. (2d) 63.

delivered by their mother to one of her daughters, a sister of plaintiffs. The cause was tried to the court sitting without a jury. The court made findings of fact, from which it drew its conclusions and entered a decree canceling the deeds. Two of the defendants have appealed.

Respondents, Charles Parris, Pearl P. Horn, Louis A. Parris, and Thomas O. Parris, and appellant Nena Benedict and defendant Ruby Ray, are sisters and brothers, and children of Mary Elizabeth Parris, a widow, now deceased. Mary Elizabeth Parris, who will hereinafter at times be referred to simply as Mrs. Parris, was eighty-three years of age at the time she executed the deeds here in question. Appellant Alvin Benedict and defendant Frank J. Ray were made parties to the action on the theory that, as the husbands of Nena Benedict and Ruby Ray respectively, they claimed some interest in the property here involved.

The respondents alleged in their complaint that, at the time she executed the deeds to Nena Benedict, Mrs. Parris was so enfeebled as to be incompetent to convey her property; that she was subject to domination by those about her; that Nena Benedict and Ruby Ray, acting in conspiracy, moved into their mother's home on or about November 10, 1945, and from that time on excluded the respondents therefrom; and that, notwithstanding a prior agreement between the mother and her children to the effect that upon the mother's death her property should be divided among the children equally, Nena Benedict and Ruby Ray coerced Mrs. Parris to sign two deeds conveying to Nena Benedict a portion of two lots then occupied by Mrs. Parris as her home, in the city of Walla Walla. The complaint further alleged that these deeds were void by reason of the mother's mental incompetence, the undue influence exerted upon her, and the want of any consideration therefor. The complaint concluded with the prayer that the court decree the deeds null and void.

Nena Benedict and Ruby Ray answered separately, both of them denying the material allegations of the complaint, and further alleging, as a separate defense with reference

to respondent Thomas Parris, that he was estopped to question the deeds executed to Nena Benedict, because in the same transaction he himself had received a similar deed from his mother conveying to him the remaining portion of the same two lots.

By way of reply, respondents admitted the execution by Mrs. Parris of the deed to Thomas Parris, but alleged that the instrument was fraudulent and void because it likewise had been procured by coercion exerted upon her, and that its invalidity had been recognized and acknowledged by Thomas Parris and the other respondents.

At the conclusion of the trial, the court specifically found that Mrs. Parris was mentally competent to execute the deeds, but that at the time of their execution she was subjected to undue influence exerted by Nena Benedict and Ruby Ray. The court further found, however, that Ruby Ray had received no part of the property conveyed by the deeds, and therefore granted a motion for nonsuit as to her and her husband, Frank J. Ray. The court then gave judgment for respondents as against Nena Benedict and her husband Alvin Benedict, who thereupon appealed.

The sole question before us is whether there is substantial evidence to sustain the trial court's conclusion that Mrs. Parris was acting under an undue influence when she executed the deeds.

The facts established by the evidence at the trial may be briefly stated. Charles L. Parris, a long-time resident of Walla Walla county, died in 1936, leaving his widow, Mary Elizabeth, and six sons and daughters, Thomas, Louis, Charles A., hereinbefore referred to as Charles, Pearl, Nena, and Ruby. Charles L. Parris, the husband and father, made no will, but in his last illness gave his watch to his son, Charles A., a violin to a daughter of Ruby, and a tract of one hundred sixty acres of farm land to Pearl. At the same time, he expressed a wish that his widow should divide the remaining property among the children at her death.

Thereafter the widow, Mrs. Parris, lived in the family home in Walla Walla, and maintained herself with modest

rentals from a remaining one hundred sixty acres of farm property and from two or three of the four small houses situated behind and to one side of her home. Charles A. and his wife lived in one of these houses and seem to have received much of their support from Mrs. Parris, since he was seldom employed. Thomas at times lived in the home with his mother, but how long he stayed there is not apparent from the record. Pearl and her husband lived on their own property, adjacent to the Parris lots, and Nena and her husband for some time lived in Pearl's home. Ruby lived with her husband and children in their own home in Walla Walla. Louis, the remaining son, lived out of town most of the time.

Sometime in August, 1943, as nearly as we can determine from the record, several members of the family were gathered in Pearl's home on a certain occasion, when Louis and Ruby became involved in a quarrel. Louis apparently struck Ruby's son, knocking him against Mrs. Parris, causing her to fall to the floor, breaking her hip. From this time on to the day of her death, Mrs. Parris was an invalid. Following that incident, but after some delay, the elderly woman was taken to a hospital, and, upon leaving, stayed at Ruby's home about four months. Thereafter, she returned to, and remained in, her own home. Each of her sons and daughters, except Louis, seems to have tried to render assistance to her, but this attention was inadequate, and Mrs. Parris was often alone. Nena and Thomas were employed, and Ruby had children to care for, so that the main burden for the time being fell upon Charles and Pearl. The mother apparently could not afford to hire a nurse, and the sons and daughters could not agree upon contributing money towards that end. In August, 1945, Pearl, who was frail and crippled, became ill and could no longer assist.

About the first of November, 1945, Nena, with her husband, moved into the Parris home and undertook full-time care of Mrs. Parris. Nena had had four or five years of experience as a practical nurse, and impartial testimony is

to the effect that from the time she took charge of her mother until the latter's death the following January, Mrs. Parris received much better care than formerly

We turn now to the several deeds here in question. Early in November, 1945, Ruby and Nena called at the office of Mr. Bean, an experienced and reputable attorney in Walla Walla, and retained him to draw those instruments. Later, Thomas called at Mr. Bean's office and discussed with him the status of the property, there having been no administration upon the father's estate. Thomas' intention was to assist Mr. Bean in his preparation of the deeds. On the tenth of November, three deeds were executed by Mrs. Parris at her home, in the presence of Mr. Bean, Dr. Garrett, who was her physician, and Reverend Snowden, the minister of her church. Two of these deeds conveyed three quarters of the two home lots, together with the improvements thereon, to Nena, and the third deed conveyed the remaining quarter, which was unimproved, to Thomas.

Mr. Bean, who had known Mrs. Parris when he was a boy, talked with her about fifteen minutes before Dr. Garrett's arrival. At the trial, Mr. Bean testified:

"I was very favorably impressed. She [Mrs. Parris] was neat and she was clean and rather dignified in appearance. Mentally I would characterize her as keen and alert at that time. She carried on, I thought, a very interesting conversation. There was no question in my mind about that fact at all."

After the doctor's arrival, Mr. Bean excluded all relatives from the room and then asked Mrs. Parris whether she understood why he and the other witnesses were there. In answer, Mrs. Parris explained that she needed care, which she was not receiving; that Nena was coming to care for her; that she wanted Nena to have the property as a home; and that she wanted Thomas to have the corner property. Mr. Bean thereupon fully explained the meaning of the deeds, and she signed them. Indicative of the fact that Mr. Bean was satisfied that Mrs. Parris was mentally competent at the time is his testimony:

"My opinion was that she was competent to execute these deeds and she knew very definitely what she wanted to do."

Dr. Garrett had been acquainted with Mrs. Parris twenty or twenty-five years, much of that time as the family physician and a close friend. He gave his opinion at the trial that her mental condition had not been affected by her hip injury, and that her mentality was the equal of any woman of her age. He stated that Mr. Bean took considerable pains to inquire of Mrs Parris whether the deeds were her own wish, and whether she had been subjected to any influence or persuasion from any outside person; that her answer was no; and that she stated she was doing this of her own free will and accord. He recalled her remark, "This is the way I want it." It was the doctor's opinion that Mrs. Parris was mentally competent, and free from duress, when she signed the three deeds.

The Reverend Snowden testified that as her neighbor and pastor he visited Mrs. Parris several times within a few months prior to the execution of the deeds, and that he considered her mental condition good for a woman of her age. He stated, "I rather think she was clear as to what she was doing."

Other evidence from disinterested persons, respecting these matters of competency and the reason for the execution of the deeds, is to the following effect:

Joseph Biersner, neighbor and acquaintance for forty years, testified that he visited Mrs. Parris several times a month in the last two years of her life, and talked with her ten or fifteen minutes in September, 1945. He stated that he observed she had aged, but that her mentality did not seem affected. It was his opinion that she "had a mind of her own"; that, mentally, she was capable of handling her own business affairs; and that, as concerned susceptibility to influence, "I don't think she could be changed if she made up her mind."

Mrs. William Long, a member of her church, and an acquaintance of about two years, visited Mrs. Parris every

two or three weeks, once the day before Thanksgiving, 1945, and once a few weeks later. She testified that, prior to Nena's coming, the mother had said: "Mrs. Long, I can't get well. They worry me all the time." Afterwards, according to the witness, Mrs. Parris' care improved: "She was neater. Her bedding and clothing were cleaner." "She seemed to be happier." In the witness' opinion, her mental condition was "good" in comparison with that of a physically normal person of her age. She testified, "I don't think she was a person that could be easily talked into anything."

William Houston, her brother, testified that he last saw Mrs. Parris in August, 1945, when he visited her during a period of two or three days, and that her mental condition then was the same as it had been three years before, "Nothing unusual."

Mrs. Beatrice Kinney, a practical nurse, whose husband was a cousin of Mr. Parris, stated that she had known Mrs. Parris more than twenty years, and was her close friend. She visited with her just before Thanksgiving, 1945, and again in December, just before Christmas. In November, Mrs. Parris told her about deeding the home to Nena. In the words of the witness, "She was very happy about it. She wanted·someone to live with her permanently and constantly." Her opinion was that at those last visits the mother's mind was "strong and clear."

Mitchell Anderson, her nephew, testified that he visited Mrs. Parris a number of times in the last year of her life, and was with her the day she died. He stated that, mentally, "She was perfectly normal and more alert than other people that age." On the last day, they talked of bringing her sons to see her, but "She didn't want them to be there."

Finally, Mrs. Isabelle Hoagland, who had known Mrs. Parris for more than forty years, testified that she visited with her about four hours on New Year's Day, 1946. Mrs. Parris at that time said that her sons had recently been in the house and had caused her a lot of nervousness, and "I wish there could be something done to keep them out." She further said that she intended to see the prosecuting attorney and procure a "peace warrant."

It would serve no useful purpose to summarize relevant evidence given by the remaining witnesses. Their hostility or bias, for one reason or another, is admitted, and their stories are at odds. It is sufficient to say that there is no testimony concerning any overt attempts to coerce Mrs. Parris to give up her property, unless we so consider threats by Charles A., who was nevertheless unsuccessful in that respect. Likewise, there is no testimony to express instances of mental incapacity on the part of Mrs. Parris, except that, at indefinite times prior to the execution of the deeds, she seemed to have no conception of time, and that she spoke to one witness of things which had not happened, and of jewelry which she did not possess. As to the disposition of her property, it fairly appears that the mother had no thought to leave a will, but intended to give away her small estate before her death. It appears from various witnesses that she intended to give a deed to her farm land to Pearl at about the time the other deeds were executed, but that Pearl was too ill to procure the papers necessary for that purpose. It also appears that Mrs. Parris authorized Ruby to give Charles A. a check for one hundred dollars, which check is in evidence, but he refused to accept it, apparently because he wanted more. As stated, some of these matters are in dispute.

The finding of the trial court that the respondents have made out a case of undue influence appears to us to rest fundamentally on a presumption. In its memorandum opinion the court sets out a statement in American Jurisprudence to the effect that a court of equity regards a conveyance between child and parent with critical eyes:

"In other words, the circumstances attending such a transaction will be vigilantly and carefully scrutinized by the court to ascertain whether there has been undue influence in procuring it." 16 Am. Jur. 463, Deeds, § 40.

The memorandum opinion then continues:

"Until the deeds in question were procured or plans made for their procurement, the pattern of life between the mother and children was the same as it had been for the prior years. The change came by virtue of the securing of

these deeds. I am sure that it was the intention of the mother to put all children on the same basis during that period of years in which these children were always in and about the home, and evidently there was a great tolerance and love between the mother and her children notwithstanding the conduct of some of the boys in regard to bootlegging. Then suddenly and without warning, this whole picture changed; three, if not four, of the children were supposed to have come strongly into her displeasure and one of the children was a crippled daughter, Mrs. Horn, who probably more than any other of the children, made sacrifices for the mother. If the mother did in fact turn against some of the children in the last month or two of her life, it was due to a relationship brought about by Mrs. Ray and Mrs. Benedict, and I am not overlooking the fact that in my judgment, Thomas O. Parris, one of the sons, was aware of and participated in the plan of conveyance of the property which only changed after he considered being short changed in the deed to him—getting half the lot instead of all the lot."

■ We draw from the evidence a conclusion different from that of the trial court.

First: We find nothing to support the court's conclusion that the mother intended an equal division of her property among her children. We are convinced from evidence which is undisputed (1) that she intended to give her most valuable property, the remaining one hundred sixty acres of farm land, to Pearl; (2) that she intended to give at least the unimproved part of her east lot to Thomas; and (3) that she did not intend to give Ruby anything, because the latter was well provided for. The remaining children were (4) Louis, who had given her no care, and from whose violence she had sustained a broken hip which caused her to be bedridden; (5) Charles, who had lived on her property, and probably her bounty, for years, and who was at least suspected of filching her purse money and groceries, and to whom she seemingly offered a check for one hundred dollars, which he is said to have angrily rejected as not enough; and (6) Nena, who shared with the others in caring for her mother prior to November, 1945, and thereafter undertook full responsibility therefor.

It is our view that the deeds were not inconsistent with the mother's probable intentions before Nena came to live with her, and particularly are we so impressed because of the simultaneous deed to Thomas of the property it was understood for a long time he would get. In short, the deeds were not unnatural, and were consistent with the circumstances then existing.

Second: As we have previously stated, there is no evidence of any pressure exerted upon Mrs. Parris to execute the deeds here in question. Nor do we find evidence of any inclination on the part of Ruby, who is said to have had the most influence with her mother, to impose upon her. In this context, it is significant to us that when she executed the deeds to Nena and Thomas, Mrs. Parris retained ownership of her farm land and some thirteen hundred dollars in her bank account, the greater part of her property. In marked contrast to this circumstance are those cases where the grantee takes to himself everything of value owned by the grantor, e.g., *Kennedy v. Currie,* 3 Wash. 442, 28 Pac. 1028; *Hattie v. Potter,* 54 Wash. 170, 102 Pac. 1023; *Perry v. Wetzel,* 122 Wash. 129, 210 Pac. 362.

Third: We gain from the evidence, especially of disinterested witnesses, the distinct impression that Mrs. Parris was not susceptible to coercion by her children. If those witnesses are to be believed, her mind was clear and strong for one of her age. Indeed, the trial court found expressly that Mrs. Parris was "mentally competent."

█ It is the essence of "undue influence" that the victim thereof is rendered incapable of acting upon his own motives. *Parr v. Campbell,* 109 Wash. 376, 186 Pac. 858. This implies a weak mentality, and it is notable that in each of four cases in which this court has approved the cancellation of deeds for undue influence exerted upon the grantors, the court found the grantor to be mentally incompetent, or virtually so. *Kennedy v. Currie, supra; Hattie v. Potter, supra; Perry v. Wetzel, supra;* and *Christensen v. Nielson,* 184 Wash. 517, 51 P. (2d) 615, the facts of which are set forth in the opinion in the earlier case of *In re Hanson's Estate,* 169 Wash. 637, 14 P. (2d) 702. Conversely,

in each of seven like cases, in which this court refused cancellation of the deeds, the grantor was found to be clear in mind, or at least not mentally incompetent. *Florin v. Florin,* 49 Wash. 37, 94 Pac. 658; *Balam v. Rouleau,* 52 Wash. 389, 100 Pac. 833; *Parr v. Campbell, supra; Thomas v. Maring,* 144 Wash. 657, 258 Pac. 465; *Fox v. Fox,* 164 Wash. 373, 2 P. (2d) 642; *McNall v. Smith,* 189 Wash. 662, 66 P. (2d) 316; *Kalkwarf v. Geschke,* 194 Wash. 135, 77 P. (2d) 612.

We do not mean to imply that undue influence is impossible unless the grantor be mentally incompetent. It is simply less probable, if the grantor is clear and strong in mind, that he would "do what is against his will, but what he is unable to refuse." *O'Neall v. Farr,* 1 Rich. L. (S. C.) 80. In such a case, before the court asserts the power to cancel a questioned deed, it must require some positive evidence, albeit circumstantial, that wrongful influence was exerted to procure the conveyance. As the cases cited abundantly demonstrate, it is one thing to "vigilantly and carefully scrutinize" the circumstances attending a deed between parent and child, and quite another thing to assume undue influence.

Upon a consideration of the whole case, our conclusion is that there is no substantial evidence pointing towards coercion in any form as the reason for the three deeds executed by Mrs. Parris on November 10, 1945.

The decree of the trial court canceling those deeds is reversed, with direction to that court to dismiss the action.

MALLERY, C. J., ROBINSON, JEFFERS, and HILL, JJ., concur.